EXTENDICARE HOMES, INC. d/ b/ a Shady Lawn Nursing Home; Extendicare, Inc.; Extendicare Health Network, Inc.; Extendicare Reit; Extendicare L.P.; Extendicare Holdings, Inc.; Extendicare Health Services, Inc.; Extendicare Health Facility Holdings, Inc.; John Does 1 Through 5; and Unknown Defendants, Movants,

v.

Belinda WHISMAN and Tony Adams, as Co–Administrators of the Estate of Van B. Adams, Deceased, Respondents.

and

Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation n/k/a Fountain Circle Health and Rehabilitation; Kindred Nursing Centers East, LLC; Kindred Hospitals Limited Partnership; Kindred Healthcare, Inc.; and Kindred Healthcare Operating, Inc., Movants

v.

Janis E. Clark, Executrix of the Estate of Olive G. Clark, Deceased, and on Behalf of the Wrongful Death Beneficiaries of Oliver G. Clark, Respondents.

and

Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation n/k/a Fountain Circle Health and Rehabilitation; Kindred Nursing Centers East, LLC; Kindred Hospitals Limited Partnership; Kindred Healthcare, Inc.; and Kindred Health Care Operating, Inc., Movants,

v.

Beverly Wellner, Individually and on Behalf of the Estate of Joe P. Well-

ner, Deceased, and on Behalf of the Wrongful Death Beneficiaries of Joe P. Wellner, Respondents.

2013–SC–000426–I
2013–SC–000430–I
2013–SC–000431–I

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

CORRECTED: OCTOBER 9, 2015

Rehearing Denied February 18, 2016

308

310

Edmund John Benson, Kathryn Todd Martin, Benson Law Offices, Lexington, Jason Patrick Renzelmann, Louisville, William James George, Frost Brown Todd, LLC, Counsel for Appellants: Extendicare Homes, Inc. d/b/a Shady Lawn Nursing Home; Extendicare, Inc.; Extendicare Health Network, Inc.; Extendicare Reit; Extendicare L.P.; Extendicare Holdings, Inc.; Extendicare Health Services, Inc.; Extendicare Health Facility Holdings, Inc.; John Does 1 through 5; and Unknown Defendants.

Cameron C. Jehl, Carey Lynn Acerra, Robert Earl Salyer, Wilkes & McHugh, P.A., Counsel for Appellees: Belinda Whisman and Tony Adams, as Co-Administrators of the Estate of Van B. Adams, Deceased.

Donald Lee Miller, II, Kristin M. Lomond, James Peter Cassidy, III, Quintairos, Prieto, Wood & Boyer P.A., Louisville, Counsel for Appellants: Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation n/k/a Fountain Circle Health and Rehabilitation; Kindred Nursing Centers East, LLC; Kindred Hospitals Limited Partnership; Kindred Healthcare, Inc.; and Kindred Healthcare Operating, Inc.

James T. Gilbert, Coy, Gilbert 86 Gilbert, Richmond, Richard Eric Circeo, Robert Earl Salyer, Wilkes 86 McHugh, P.A., Lexington, Counsel for Appellees: Janis E. Clark, Executrix of the Estate of Olive G. Clark, Deceased, and on Behalf of the

Wrongful Death Beneficiaries of Oliver G. Clark and Beverly Wellner, Individually and on Behalf of the Estate of Joe P. Wellner, Deceased, and on Behalf of the Wrongful Death Beneficiaries of Joe P. Wellner.

## OPINION OF THE COURT BY JUSTICE VENTERS

This decision consolidates three cases accepted by this Court for discretionary review pursuant to CR 65.09. By way of motions for interlocutory relief under CR 65.09, Extendicare Homes, Inc. d/b/a/ Shady Lawn Nursing Home ("Extendicare"), and its affiliated entities,[1] and Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre For Health and Rehabilitation n/k/a Fountain Circle Health and Rehabilitation ("Kindred") and its affiliated entities,[2] seek relief from orders of the Court of Appeals refusing to compel arbitration of disputes pending in Clark Circuit Court and the Trigg Circuit Court.

Each of the three cases originated with the filing of an action in the circuit court asserting claims against the nursing home for personal injuries suffered by the nursing home resident, violations of KRS 216.510 et seq.,[3] and for wrongful death of the resident. In each case, at the time of the resident's admission to the nursing home, an attorney-in-fact for the resident executed a written document providing that any claims or disputes arising out of the relationship between the resident and the nursing home would be submitted to arbitration, rather than adjudication in the courts. Upon the commencement of each case in circuit court, the defendant nursing home facility moved the court to dismiss the action and compel the parties to submit the claims to a formal arbitration proceeding. In each case, citing our opinion in *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581 (Ky. 2012), *cert. denied*, —— U.S. ——, 133 S.Ct. 1996, 185 L.Ed.2d 879 (2013), the circuit court denied the motion on the grounds that the respective power-of-attorney instruments did not authorize the resident's attorney-in-fact to waive the resident's right to access to the courts for the resolution of disputes.

Kindred and Extendicare each sought interlocutory relief in the Court of Appeals pursuant to CR 65.07. The Court of Appeals declined to grant the requested relief. Kindred and Extendicare then sought relief in this Court.

The central issue is whether, based upon the language of the particular power-of-attorney instrument, an arbitration agreement was validly formed between the respective nursing home facility and the resident whose interests were thereby affected. For the reasons set forth below, we conclude in two of the cases, *Extendicare Homes, Inc., et al, v. Whisman* (Case No. 2013–SC–426–I) and *Kindred Nursing Centers Limited Partnership, et al., v. Wellner* (Case No. 2013–SC–431–I), that the authority to enter into a pre-dispute arbitration agreement was not among the powers granted to respective attorney-in-fact and, therefore the arbitration agreements were not formed with the assent of the party to be bound thereby. Lacking

---

1. Extendicare, Inc.; Extendicare Health Network, Inc.; Extendicare Reit; Extendicare L.P.; Extendicare Holdings, Inc.; Extendicare Health Services, Inc.; Extendicare Health Facility Holdings, Inc.; John Does 1 Through 5; and Unknown Defendants.

2. Kindred Nursing Centers East, LLC; Kindred Hospitals Limited Partnership; Kindred Healthcare, Inc.; and Kindred Health Care Operating, Inc.

3. KRS 216.515 enumerates certain enforceable rights extended to nursing home residents.

the essential element of assent, we conclude that the arbitration agreements in those cases were never validly formed.

We further conclude that without a clear and convincing manifestation of the principal's intention to do so, we will not infer the delegation to an agent of the authority to waive a fundamental personal right so constitutionally revered as the "ancient mode of trial by jury."[4] Consequently, because none of the power-of-attorney instruments involved in these cases provide a manifestation of the principal's intent to delegate that power to his agent, we conclude that the agent was not so authorized, and that the principal's assent to the waiver was never validly obtained. Accordingly, we deny the motions for interlocutory relief. In so doing, we affirm the orders of the Court of Appeals.

■ At the outset, however, it is appropriate that we direct our attention specifically to the cause of action pled in each case for wrongful death. We held in *Ping*, and we reiterate today: the decedent whose death becomes the basis of a wrongful death claim had no authority during his lifetime, directly or through the actions of his attorney-in-fact, to prospectively bind the beneficiaries of the wrongful death claim to an arbitration agreement.

## I. THE WRONGFUL DEATH BENE-FICIARIES ARE NOT BOUND BY THE ARBITRATION AGREE-MENTS IN ISSUE HERE

■ In *Ping*, 376 S.W.3d at 597–600, we squarely confronted the question of whether a decedent, by her own action or through the action of her attorney-in-fact, could enter into contracts of any kind that would bind the rights of the beneficiaries of wrongful death claims made in connection with her own death. Based upon

well-settled precedent and upon the constitutional and statutory structure of Kentucky's wrongful death law, we determined that a wrongful death claim does not "derive from any claim on behalf of the decedent, and [the wrongful death beneficiaries] do not succeed to the decedent's dispute resolution agreements." *Id.* at 600.

Section 241 of the Kentucky Constitution declares: "The General Assembly may provide how the recovery [from a wrongful death action] shall go and to whom belong." In KRS 411.130(2), the General Assembly designated the persons to whom such claims belong. In *Ping*, we quoted *Moore v. Citizens Bank of Pikeville*, 420 S.W.2d 669, 672 (Ky. 1967), holding that "the wrongful death action is not derivative ... [It] is distinct from any [cause] that the deceased may have had if he had survived." *Id.* We recently reaffirmed that holding in *Pete v. Anderson*:

> Under the plain language of the statute, the cause of action "belongs" to the beneficiaries of the wrongful death claim, as the amount recovered in a wrongful death action "shall be for the benefit of and go to the kindred of the deceased[.]" KRS 411.130(2) .... With no interest in the recovery, the personal representative is a "nominal" party, as the "real parties in interest are the beneficiaries whom [the personal representative] represents." (citing *Vaughn's Administrator* [297 Ky. 309], 179 S.W.2d 441, 445 (1944)).

413 S.W.3d 291, 299 (Ky. 2013). Moreover, *Pete* expressly and explicitly noted that "*Ping* ... puts to rest any dispute as to whether the statutory beneficiaries are the real parties in interest to a wrongful death action." *Pete*, at 300.

4. Ky. Const. § 7.

Under Kentucky law, a wrongful death claim is a distinct interest in a property right that belongs *only* to the statutorily-designated beneficiaries. Decedents, having no cognizable legal rights in the wrongful death claims arising upon their demise, have no authority to make contracts disposing of, encumbering, settling, or otherwise affecting claims that belong to others. The rightful owners of a wrongful death claim, the beneficiaries identified in KRS 411.130(2), cannot be bound to the contractual arrangements purportedly made by the decedent with respect to those claims.[5] A decedent has no more authority to bind the wrongful death beneficiaries to an arbitration agreement than he has to bind them to a settlement agreement fixing or limiting the damages to be recovered from the wrongful death action, limiting the persons against whom a claim could be pursued, or an agreement on how and to whom to allocate the damages recovered in a wrongful death claim.[6] Our analysis in *Ping* was thorough, complete, correct, and unanimous. We reaffirmed it in *Pete* and we have no reason to retreat from it now.[7]

In contrast with the wrongful death claims, the personal injury and statutory claims arising under KRS 216.510 *et seq.* belong to the decedents; and the respective estates succeeded to those claims, at least to the extent that such claims survive the decedent's death pursuant to KRS 411.140[8] and 216.515(26).[9] We now redi-

---

**5.** *See McWethy's Adm'x v. McCright,* 141 Ky. 816, 133 S.W. 1001, 1002 (1911) ("A child has no interest in property of the parent while the latter is living; and this court has frequently held that the child cannot incumber [sic], sell, or otherwise dispose of a mere expectancy in the estate of the parent.").

**6.** We note here, as we did in *Ping,* that it is of no consequence that the person signing the arbitration agreement *in her representative capacity as attorney-in-fact,* is individually, one of the statutorily-designated wrongful death beneficiaries. By explicitly signing in that representative capacity, the agent does not bind herself, personally, to the terms of the agreement, and care must be taken not to "conflate" the two distinct entities involved. *See Ping,* 376 S.W.3d at 599 ("By executing the arbitration contract, Ms. Ping purported to agree on her mother's behalf, not her own, to arbitrate her mother's claims. Even were her mother's agreement valid, Ms. Ping's having executed it as her mother's representative would not preclude Ms. Ping, as representative of the wrongful death beneficiaries, from litigating their entirely separate claim.").

**7.** We are aware that at least one federal trial judge takes issue with our analysis in *Ping. See Golden Gate Nat. Senior Care, LLC v. Addington,* 14–CV–327–JMH, 2015 WL 1526135, at *8–9 (E.D. Ky. Apr. 3, 2015). The judge in that case contends that *Ping's*

holding with respect to the rights of the wrongful death beneficiaries is wrong because it "effectively nullif[ies] arbitration in the wrongful death context" and runs counter to *Marmet Health Care Center, Inc. et al v. Clayton Brown et al.* —— U.S. ——, 132 S.Ct. 1201, 1203, 182 L.Ed.2d 42, (2012) and *Marmet's* "emphatic federal policy in favor of arbitral dispute resolution" and concludes that the FAA "includes no exception for personal-injury or wrongful-death claims." The fallacy of that position is obvious: 1) arbitration agreements in wrongful death cases are not nullified because wrongful death beneficiaries are free, as they always have been, to enter into arbitration agreements regarding their wrongful death claims; and 2) as we explained in *Ping,* the ownership status of a wrongful death varies from state to state depending upon the statutory and constitutional provisions that create the right. *Ping,* at 598. The federal and state policies favoring arbitration do not displace well-settled principles of contracts, property, and due process that bar individuals from making contracts that dispose of rights and property interests belonging to other people.

**8.** KRS 411.140 provides: "No right of action for personal injury or for injury to real or personal property shall cease or die with the person injuring or injured, except actions for slander, libel, criminal conversation, and so much of the action for malicious prosecution

rect our attention to those claims, to determine based on *Ping* and other applicable law, whether the attorneys-in-fact in these cases had the authority to enter into a pre-dispute agreement to arbitrate any claims arising between the respective principals and the nursing home facilities providing their care.

## II. FACTUAL AND PROCEDURAL BACKGROUND—POWERS GRANTED TO THE RESPECTIVE ATTORNEYS–IN–FACT

The facts as relevant to the issues we review in each case are remarkably similar. Of course, the law relating to arbitration agreements and powers-of-attorney instruments applies equally to each case. However, because each of the power-of-attorney instruments involved in the three cases expresses the authority delegated by the principal to the attorney-in-fact in different terms, each instrument requires a separate analysis. We proceed with a review of the essential facts of each case.

### A. Extendicare Homes, Inc. d/b/a Shady Lawn Nursing Home v. Whisman, Case No. 2013–SC–426–I.

On February 21, 2011, Van Buren Adams executed a power-of-attorney document (the Adams–Whisman POA) designating his daughter, Belinda Whisman, as his attorney-in-fact. About a month later, Adams was admitted as a resident at Extendicare's Shady Lawn Nursing Home. As Adams' attorney-in-fact, Whisman executed the documents required by Extendi-

care for Adams' admission to the nursing home. She also signed a four-page document presented by Extendicare's admission staff, styled "Alternative Dispute Resolution Agreement." We refer to that document as "Extendicare's arbitration agreement." At the top of the first page, in all-capital letters and in underlined font, the document states that "SIGNING THIS AGREEMENT IS NOT A CONDITION OF ADMISSION TO OR CONTINUED RESIDENCE IN THE CENTER." On the second page, the document declares in capital letters that:

> THE PARTIES UNDERSTAND, ACKNOWLEDGE AND AGREE THAT BY ENTERING INTO THIS AGREEMENT, THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED BY A COURT OF LAW OR TO APPEAL ANY DECISION OR AWARD OF DAMAGES RESULTING FROM THE ALTERNATIVE DISPUTE RESOLUTION PROCESS, EXCEPT AS PROVIDED HEREIN.

Extendicare's arbitration agreement also provided a comprehensive list of "covered disputes" which included the same statutory and common law claims later asserted in this action.

Adams died less than three months after his admission to Shady Lawn. The co-administrators of his estate, Belinda Whisman and Tony Adams, brought suit in the Trigg Circuit Court, naming as defendants the various entities that owned and operated Shady Lawn Nursing Home. The com-

---

as is intended to recover for the personal injury. For any other injury an action may be brought or revived by the personal representative, or against the personal representative, heir or devisee, in the same manner as causes of action founded on contract."

9. *See also Overstreet v. Kindred Nursing Centers Limited Partnership,* 2013–SC000620–DG,

2015 WL 4967188 at *7 (Ky. Aug. 20, 2015) (holding that claims asserted under KRS 216.515 for violations of a nursing home resident's rights, except for personal injury or property damage claims falling within the protective scope of KRS 411.140, may be brought only by "the resident or his guardian" during the resident's lifetime. KRS 216.515(26)).

plaint. alleged personal injuries to Adams caused by negligence, violations of KRS 216.510 *et seq.*, and wrongful death. Based upon the arbitration agreement, Extendicare moved the court to dismiss the lawsuit and to order the plaintiffs to submit their claims to arbitration. The plaintiffs argued that the power-of-attorney document did not vest Whisman with the authority to commit Adams' claims to arbitration. As relevant in this case, and as relied upon by Extendicare, the instrument provided as follows:

I, VAN BUREN ADAMS ... appoint my daughter, BELINDA WHISMAN, .... my true and lawful attorney-in-fact, with full power for me and in my name and stead, ... **to draw, make and sign any and all checks, contracts, notes, mortgages, agreements, or any other document including state and Federal tax returns;** ... [and] **to institute or defend suits concerning my property or rights,** ... [.]

(emphasis added).

Extendicare argued below, as it does here, that the authority "to institute or defend suits concerning my property or rights" implicitly carried with it the authority to enter into the pre-dispute arbitration agreement. The Trigg Circuit Court denied Extendicare's motions and concluded that the Adams–Whisman POA "would not give Ms. Whisman the understanding that her authority would apply to ... a waiver of the important right of bringing a lawsuit before a jury rather than before an arbitration panel."

The trial court reasoned that, despite the differences between the Adams–Whisman POA and the POA involved in *Ping,* nevertheless, the general principles governing *Ping* also applied here. The circuit court expressly noted our cautionary statement in *Ping* that "[a]bsent authorization in the power of attorney to settle claims

and disputes or some such express authorization addressing dispute resolution, authority to make such a waiver is not to be inferred lightly." *Id.* at 593.

From this adverse ruling of the trial court, Extendicare sought immediate interlocutory relief in the Court of Appeals pursuant to CR 65.07. The Court of Appeals denied the motion, expressed its agreement with the trial court's application of *Ping,* and further grounded its opinion on *Ping's* comprehensive references to the law of agency, especially *Restatement (Third) of Agency* § 2.02 comment h. (2006):

[S]ome acts that are otherwise legal create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal. A reasonable agent should consider whether the principal intended to authorize the commission of collateral acts fraught with major legal implications for the principal, such as granting a security interest in the principal's property or executing an instrument confessing judgment. In such circumstances, it would be reasonable for the agent to consider whether a person in the principal's situation, having the principal's interests and objectives, would be likely to anticipate that the agent would commit such a collateral act, given the nature of the principal's specific direction to the agent.

The Court of Appeals concluded, quoting both *Ping* and *Restatement (Third) of Agency,* that "an arbitration agreement would 'create legal consequences for a principal that are significant and separate from the transactions specifically directed by the principal,'" further noting that the explicit authority "'to institute or defend suits concerning my property or rights' did not imply the authority to initiate a claim in arbitration, or, correspondingly to waive

Adams' right to seek redress in a court of law."

### B. Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation v. Clark, Case No. 2013–SC–430–I.

On August 31, 2006, Olive G. Clark executed a power-of-attorney document (the Clark POA) designating her daughter, Janis Clark, as her attorney-in-fact. Nearly two years later, on August 16, 2008, Olive Clark became a resident of Kindred's Winchester Centre for Health and Rehabilitation a/k/a Fountain Circle Health and Rehabilitation ("Winchester Centre"). Janis, as Olive's attorney-in-fact, executed for Olive the paperwork Kindred required for Olive's admission to Winchester Centre. At the same time, Janis, acting as Olive's attorney-in-fact, also signed a four-page document styled "Alternative Dispute Resolution Agreement Between Resident and Facility (Optional)." We refer to this document as "the Kindred arbitration agreement."

The Kindred arbitration agreement stipulates that "[a]ny and all claims or controversies arising out of or in any way relating to this ADR Agreement ... or the Resident's stay at the Facility ... shall be submitted to alternate dispute resolution as described in this Agreement." The document also defines "alternate dispute resolution" to include "binding arbitration." In the same nondescript font as the rest of the provisions, the document warns that "[b]inding arbitration means that the parties are waiving their right to a trial, including their right to a jury trial, their right to trial by a Judge and their right to appeal the decision of the arbitrator(s)." In its final paragraph, the agreement provides that "execution of this Agreement is not a precondition to the furnishing of services to the Resident by the Facility."

Olive died about eight months later. Janis Clark, as executrix of Olive's estate and on behalf of the wrongful death beneficiaries, filed suit in the Clark Circuit Court against Kindred. The complaint asserted causes of action for personal injury, violations of KRS 216.510 *et seq.*, and wrongful death. Kindred moved to dismiss the action or, alternatively, to stay the action pending arbitration pursuant to the Kindred arbitration agreement.

In January 2012, the Clark Circuit Court granted Kindred's motion and entered a final order dismissing the pending lawsuit and compelling arbitration of the claims. However, following the August 23, 2012 rendition of *Ping,* and upon consideration of Janis's CR 60.02 motion, the circuit court vacated the order of dismissal. Based expressly upon the principles set forth in *Ping,* in November 2012, the trial court ruled that the Clark POA did not provide Janis Clark with the authority "to waive Olive Clark's jury trial rights."

As relevant here, Olive's POA endowed Janis with:

[the] **full power for me and in my name, place, and stead, in her sole discretion, to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way.** Without limiting or derogating from this general power, I specifically authorize my attorney in fact for me and in my name, place, and stead, in her sole discretion:

To prepare and complete administrative documents necessary to secure or preserve any and all governmental benefits available to me;

To lease, sell, or convey any real or personal property that I may now or ever own;

To mortgage my property as she sees fit;

To receive and receipt for any money which may now or hereafter be due to me;

To retain and release all liens on real or person property;

To draw, make, and sign in my name any and all checks, promissory notes, contracts, deeds or agreements;

To invest or reinvest my money for me;

**To institute or defend suits concerning my property or rights;**

To file all tax returns (including, without limitation, state and federal income tax returns);

To enter all safe deposit boxes;

To transfer assets of mine to any trust created by me for addition to trust principal; and

**Generally to do and perform for me and in my name all that I might do if present.**

Also, without limiting or derogating from this general power, I authorize my attorney in fact to make all decisions regarding my health care and medical treatment.

(emphasis added).

Kindred sought relief in the Court of Appeals pursuant to CR 65.07. The Court of Appeals denied Kindred's application for relief, relying upon the same rationale set out in its Extendicare opinion: namely, its interpretation of agency law as provided by the *Restatement (Third) of Agency* and our decision in *Ping*. Like Extendicare, Kindred now seeks further review in this Court pursuant to CR 65.09. Kindred also asserts the additional claim that the attempt of the Clark Circuit Court to resurrect the dismissed case under CR 60.02 was ineffective because the circuit court had lost jurisdiction of the case following the entry of its January 2012 order dismissing the case.

### C. Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation v. Wellner; Case No. 2013–SC–431–I.

On May 15, 2008, Joe Paul Wellner executed a power-of-attorney naming his wife, Beverly M. Wellner, as his attorney-in-fact. Three months later, he was admitted to Kindred's Winchester Centre. Beverly signed the Kindred admission documents as Joe's attorney-in-fact. She also signed Kindred's optional arbitration agreement. Joe resided at Winchester Centre for the next thirteen months, until a few days before his death on June 19, 2009. Beverly, individually, and as administratrix on behalf of her husband's estate and the wrongful death beneficiaries, brought suit in the Clark Circuit Court asserting the above-referenced claims.

The *Wellner* case shares many common elements with the *Clark* litigation. The complaints in both cases arise out of the same nursing home facility and assert the same causes of action—personal injury, wrongful death, and violations of KRS 216.510, *et seq*. The two cases were filed contemporaneously in the Clark Circuit Court; the parties on both sides of the two cases are represented by the same lawyers, and both cases were heard by the same circuit court judge, Hon. Jeanne C. Logue.

Like the *Clark* case, Judge Logue initially dismissed the *Wellman* case in favor of arbitration. After *Ping*, the judge reconsidered the case pursuant to CR 60.02 and reversed the prior ruling. Upon review, the Court of Appeals affirmed. Of course, the most determinative feature of this case, as well as the others, is the language of the power-of-attorney document. Not surprisingly, the power-of-attorney instrument in this case differs from those found in the other cases under review. In pertinent part, it provides Bever-

ly M. Wellner with authority to exercise the following powers on behalf of Joe:

1. To receive, take receipt for, and hold in possession, manage and control all property, both real and personal, which I now or may hereafter own, hold, possess or be or become entitled to with full power to sell, mortgage or pledge, assign, transfer, invest and reinvest the same or any part thereof in forms of investment, including bonds, notes and other obligations of the United States deemed prudent by my said wife in her discretion, with full power to retain the same without liability for loss or depreciation thereof.

2. **To demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor).**

3. To make, execute, deliver and endorse notes, drafts, checks and order for the payment of money or other property from or to me or order in my name.

4. To make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance.

5. To have access to my safe deposit boxes, act as my proxy with power of substitution to vote all stocks or securities in my name in relation to any individual or corporate action, to deposit any stocks or securities in connection with any plans of prospective or reorganization committees, to accept and exercise all rights, to subscribe for securities and to sell same.

6. To receive and receipt for all rents and income to which I am or may become entitled, pay therefrom all necessary expenses for the maintenance, upkeep, care and protection of my property, deduct therefrom her own reasonable compensation, and pay the net income from time to time to me or in such manner as I shall direct, or in the absence of such payment to me or at my discretion, to invest the same for me in her judgment in the manner above described.

7. To prepare, execute and file federal or state income tax returns and other real and personal property tax lists and to pay all such taxes.

8. In the event of my illness, incapacity or other emergency to have full power to make all health care decisions for me and in my stead; this power shall encompass the power to make any decision which I might myself make in authorizing or refusing treatment, surgery or other health care. My Attorney-in Fact shall have the right to refuse the administration of nutrition and hydration.

9. If I should every need a guardian or curator or similar person or entity to assist me if I am unable to fully handle all of my affairs, and if this Power of Attorney should not be sufficient therefor, I nominate my wife, BEVERLY M. WELLNER, as my guardian, curator, etc., and I specifically provide that surety not be required on her bond as such.

10. I hereby further grant unto my Attorney-in-Fact full power in and concerning the above premises and to do any and all acts as set forth above as fully as I could do if I were personally present, and at my decease to pay, transfer and deliver over to my personal representative, all principal and income then in his possession and control, and I do ratify and confirm whatever my said Attorney-in-Fact shall lawfully do under these presents, provided however, that my attorney shall not bind me as surety, guarantor for accommodation nor give away any of my estate, whatsoever, nor

shall my attorney be authorized to accept service of process for or on my behalf. . . .

(emphasis added).

Like the other two cases, the *Wellner* case comes to this Court pursuant to CR 65.09. As in the *Clark* case, Kindred also challenges in *Wellner* the jurisdiction of the circuit court to set aside, pursuant to CR 60.02, the original order of dismissal entered several months earlier.

## III. ANALYSIS

■ As in *Ping,* our disposition of these cases requires no consideration of the specifics of the respective arbitration agreements. There is no dispute that *if* the arbitration agreements were validly formed, they are enforceable as written under both the Kentucky Uniform Arbitration Act (KUAA), KRS 417.050 *et seq.,* and the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1 *et seq.,* at least with respect to the decedents' claims for personal injury and statutory violations. Consequently, the disputes before us are not about the *enforcement* of validly formed arbitration agreements covered by the KUAC and the FAA. Rather, the disputes are about the *formation* of the arbitration agreements; and specifically, whether the agent purporting to sign the arbitration agreement on behalf of his principal had the authority to do so.

■ All three of the arbitration agreements involved here provide that the Kentucky Arbitration Act shall govern, with secondary reliance upon the Federal Arbitration Act if the Kentucky law is found to be inapplicable. Choice of law provisions are generally valid in arbitration clauses. *Hathaway v. Eckerle,* 336 S.W.3d 83, 87 (Ky. 2011). However, as applicable to this case, there is no material difference between the FAA and the KUAC.

■ Like its federal counterpart, Kentucky law favors the enforcement of arbitration agreements. *Ally Cat, LLC v. Chauvin,* 274 S.W.3d 451, 457 (Ky. 2009) ("We do not by this opinion signify any retreat from our recognition of the prevalent public policy favoring enforcement of agreements to arbitrate."). Doubts about the scope of issues subject to arbitration should be resolved in favor of arbitration. *See Louisville Peterbilt, Inc. v. Cox,* 132 S.W.3d 850, 855 (Ky. 2004) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)).

■ Nevertheless, before the *enforcement* of an arbitration agreement can be addressed, it must be established that an arbitration agreement was *formed. Mt. Holly Nursing Center v. Crowdus,* 281 S.W.3d 809, 813 (Ky. App. 2008). Unless an arbitration agreement was validly formed, there is no arbitration agreement to be enforced. Questions concerning the formation of an arbitration agreement are resolved in accordance with the applicable state law governing contract formation. *See JPMorgan Chase Bank, N.A. v. Bluegrass Powerboats,* 424 S.W.3d 902, 907 (Ky. 2014) ("[E]ven the federal authorities agree that *whether* there is a valid arbitration agreement is a matter of state contract law, so long as the state law in question does not single out arbitration agreements."). We clarified in *Ping:*

a party seeking to compel arbitration has the initial burden of establishing the existence of a valid agreement to arbitrate . . . [T]hat initial showing is addressed to the court, not the arbitrator[ ] . . . and the existence of the agreement depends on state law rules of contract formation. . . . An appellate court reviews the trial court's application of those rules *de novo,* although the trial court's factual findings, if any, will

be disturbed only if clearly erroneous. [citing *North Fork Collieries v. Hall,* 322 S.W.3d 98, 102 (Ky. 2010) ].

376 S.W.3d at 590 (citations omitted).

 The fundamental principle of contract formation is that "[t]o create a valid, enforceable contract, there must be a voluntary, complete assent by the parties having capacity to contract." *Conners v. Eble,* 269 S.W.2d 716, 717–18 (Ky. 1954). This principle applies with no less vigor when the issue is formation of an arbitration contract. "Assent to be bound by the terms of an [arbitration] agreement must be expressed." *Ally Cat,* 274 S.W.3d at 456. A person's assent to a contractual agreement can be provided by an agent acting as an attorney-in-fact, *if* the authority to do so was duly conferred upon the attorney-in-fact by the power-of-attorney instrument. Conversely, if that authority was not so conferred by the principal, the requisite assent, of course, cannot be provided by the attorney-in-fact.

 Whether the principal's assent to the arbitration agreement was obtained is, in each of the cases under review, a ques-tion of law that depends entirely upon the scope of authority set forth in the written power-of-attorney instrument. *Ping,* at 590. *Ping* further clarifies:

> The scope of [the agent's] authority is thus left to the principal to declare, and generally that declaration must be express ... [E]ven a "comprehensive" durable power would not be understood as implicitly authorizing all the decisions a guardian might make on behalf of a ward. Rather, we have indicated that an agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document and subject always to the agent's duty to act with the "utmost good faith."

*Id.* at 592. (citations omitted).

Focusing even closer on the question of whether, by way of a durable power-of-attorney, a principal vested his agent (his attorney-in-fact) with the authority to select arbitration and its concomitant waiver of the constitutional right of access to the courts, *Ping* cites to *Restatement (Third) of Agency* § 2.02 comment h. (2006).[10] We

---

10. Restatement (Third) Of Agency § 2.02 (2006)

> *h. Consequences of act for principal.* Even if a principal's instructions or grant of authority to an agent leave room for the agent to exercise discretion, the consequences that a particular act will impose on the principal may call into question whether the principal has authorized the agent to do such acts.
>
> Three types of acts should lead a reasonable agent to believe that the principal does not intend to authorize the agent to do the act. First are crimes and torts. If a principal authorizes the agent's commission of a crime or an intentional tort, the principal will be subject to liability for the agent's wrongdoing. *See* § 7.04. The agent, additionally, will be subject to individual liability. *See* § 7.01. An agent is under no duty to obey a direction from the principal to commit such an act. *See* § 8.09(2). The bounds of the law are applicable to all,

including principals, whether or not individuals. *See* Principles of Corporate Governance: Analysis and Recommendations § 2.01 and Comment *g.*

Second, acts that create no prospect of economic advantage for a principal, such as gifts and uncompensated uses of the principal's property, require specific authorization. This is so even if an agent has notice that the principal acts philanthropically as to matters unconnected to the agency. Moreover, if it is normally not reasonable to believe that the principal will benefit from an act, a reasonable agent should not infer that the principal wishes the agent to do the act and therefore should not commit the act unless the principal communicates specifically that the principal wishes the act to be done. Thus, an agent should not infer that the principal wishes gifts to be made from the principal's property from the fact that the principal has authorized the agent to manage the principal's property and has

said that "a collateral agreement to waive the principal's right to seek redress of grievances in a court of law" [11] was an act "with significant legal consequences." We emphasized: "Absent authorization in the power of attorney to settle claims and disputes or some such express authorization addressing dispute resolution, authority to make such a waiver is not to be inferred lightly." *Id.* at 593.

*Ping* faithfully applied the age-old principle that a power-of-attorney must be strictly construed in conformity with the principal's purpose. *Harding v. Kentucky River Hardwood Co., quoting U.S. Fidelity Co. v. McGinnis,* 147 Ky. 781, 145 S.W. 1112 (1912), states:

> It is the law that a formal instrument conferring authority will be strictly construed, and can be held to include only those powers which are plainly given, and those which are necessary, essential and proper to carry out those expressly given. It will be presumed that the principal, in conferring a power intended to confer with it the right to do those things without the object contemplated could not be accomplished, but beyond this the authority will not be extended by construction.

205 Ky. 1, 265 S.W. 429, 431 (1924) (citations omitted).

We apply these same venerable principles to the cases at hand. We look now at the specific language of the respective POA documents that, as claimed by Extendicare and Kindred, authorized the agents to enter into arbitration agreements.

### 1. The Adams–Whisman POA

Extendicare identifies only two expressions of authority mentioned in the Adams/Whisman POA to support its claim that Adams had authorized Whisman to enter into a pre-dispute arbitration agreement. First, Extendicare points to the power to "institute or defend suits concerning [Adams'] property or rights." Second, Extendicare relies upon Whisman's power "to draw, make and sign any and all checks, contracts, notes, mortgages, agreements, or any other document including state and Federal tax returns."

### a. The power to "institute or defend suits concerning my property rights" did not confer the authority to enter in a pre-dispute arbitration agreement.

Extendicare posits that the grant of specific authority to "institute or defend suits concerning my property rights" is an express authorization by Adams giving Whisman the power to choose arbitration

given the agent discretion in making management decisions. For treatment of the authority of an agent to make gifts under a durable power of attorney, *see* Restatement Third, Property (Wills and Other Donative Transfers) § 8.1, Comment *l*.
Third, some acts that are otherwise legal create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal. A reasonable agent should consider whether the principal intended to authorize the commission of collateral acts fraught with major legal implications for the principal, such as granting a security interest in the principal's property or executing an instrument confessing judgment. In such circumstances, it would be reasonable for the agent to consider whether a person in the principal's situation, having the principal's interests and objectives, would be likely to anticipate that the agent would commit such a collateral act, given the nature of the principal's specific direction to the agent.

11. By "collateral" agreement we referred to the separate, optional arbitration agreement signed in conjunction with, but not incorporated into, the other contractual arrangements for residential care. The arbitration agreements involved in this case are "collateral" agreements.

as the mode for resolving disputes over his property rights. We disagree for several reasons.

First, at the most elementary level, even if we agreed that the conduct of initiating an arbitration proceeding for personal injury claims was functionally equivalent to instituting a suit concerning Adams's property rights, the act that required authorization was not *the act of initiating an arbitration proceeding.* Obviously, Whisman never initiated an arbitration proceeding. The action under review is *the signing of the pre-dispute arbitration agreement* when no personal injury or property rights were in dispute. That conduct does not remotely resemble the institution of a property rights claim.

We agree that the power to "institute or defend suits concerning my property rights" would necessarily encompass the power to make litigation-related decisions within the context of a suit so instituted, including the decision to submit the pending dispute to mediation or arbitration. But that, too, is not what Whisman did. Whisman's action, at the time it was taken, had absolutely nothing to do with the institution or defense of claims concerning Adams property rights. Instituting *"suits concerning my property rights"* is not practically or conceptually similar in any way to making an agreement that future claims will be taken to arbitration.

Secondly, the current edition of Black's Law Dictionary defines "suit" as "[a]ny proceeding by a party or parties against another *in a court of law."* SUIT, BLACK'S LAW DICTIONARY (10th ed. 2014) (emphasis added). By way of comparison, an earlier edition of Black's Law Dictionary defines "suit" as "any proceeding by one person or persons against another or others *in a court of justice in which a plaintiff pursues, in such court,* the remedy the law affords him for the redress of an injury or the enforcement of a right[.]" BLACK'S LAW DICTIONARY, 1603 (4th ed. 1968) (emphasis added). There is no doubt that in the language of the law, a "suit" occurs in a court · of law; arbitration by its very purpose and design is intended to *avoid* suits in a court of law; it is the antithesis of a suit in a court of law.

The New Oxford American Dictionary defines "suit" in the context that concerns us, as "short for lawsuit."[12] In turn, "lawsuit" is defined as "a claim or dispute brought to a court for adjudication."[13] *See Shepherd v. Standard Motor Co.,* 263 Ky. 329, 92 S.W.2d 337, 337 (1936) ("This term ['lawsuit'] is defined and generally recognized as a suit at law or in equity; an action or a proceeding in a civil court; a process in law instituted by one party to compel another to do him justice.") (citations omitted).

Thus, in both common and legal parlance, "instituting suits concerning my property rights" manifests a specific intention to pursue one's rights in the courts of law, not by private arbitration. Instituting a suit is not the same thing as initiating a claim in arbitration; the two are mutually exclusive actions. Far from being consistent with the explicitly-stated authority to institute a lawsuit, Extendicare's arbitration agreement *expressly prohibits* Whisman from doing the very thing that Adams's POA unequivocally authorized her to do.

■■■ Extendicare's position is that the "institute or defend suits" language of the Adams/Whisman POA is a general authorization for engaging in litigation, which implicitly provides the authority to do what-

---

12. NEW OXFORD AMERICAN DICTIONARY 1740 (Oxford University Press, 3d ed. 2010).

13. NEW OXFORD AMERICAN DICTIONARY 989 (Oxford University Press, 3d ed. 2010).

ever is incidental to the suit or reasonably necessary to achieve the purpose of the litigation. *See Restatement (Second) of Agency* § 35 (1958) ("Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it."). However, we cannot rationally say that signing an arbitration agreement was "incidental to" a claim concerning Adams' property rights when the specific right, to which the claim is allegedly "incidental," did not exist. An act cannot be "incidental" to something that does not exist or has not happened. An arbitration agreement signed *before* a cause of action exists cannot be "reasonably necessary" to the resolution of that cause. Whisman's execution of the arbitration agreement was not "incidental" to or "reasonably necessary" in the furtherance of any claim at all concerning Adams' property rights.

We agree that the "institute or defends suits" provision in the POA would authorize the attorney-in-fact to do what is reasonably necessary in the management of an actual claim or lawsuit, including the authority to settle or compromise the claim. Like countless other decisions required in the management of a lawsuit, settling a claim is within the ambit of the power expressly granted here. Nothing in our analysis would prevent Whisman or any similarly-situated attorney-in-fact from exercising her judgment in that regard. However, an agreement to submit a dispute to arbitration is the diametrical *opposite* of "settling" a claim. Settling a claim ends the controversy, whereas arbitrating a claim means fighting it out before an arbitrator rather than a judge and jury.

Whisman's act of signing Extendicare's arbitration agreement was not "incidental" to or "reasonably necessary" to the institution or defense of a "suit" concerning Adams' property rights. Instead, it expressly forfeited Adams' constitutional rights to have disputes decided in a court of law and to appeal any decision or award of damages arising therefrom, a point that we address in further detail in Part IV of this opinion.

**b.** ***The power "to draw, make and sign any and all checks, contracts, notes, mortgages, agreements, or any other document including state and Federal tax returns" does not confer the authority to enter in a pre-dispute arbitration agreement.***

 Extendicare also argues that Whisman had the authority to sign a pre-dispute arbitration agreement as an exercise of the express power set forth in the Adams–Whisman POA to "to draw, make and sign any and all checks, contracts, notes, mortgages, agreements, or any other document including state and Federal tax returns." *Ping* squarely refutes that argument.

We held in *Ping* that powers granted expressly in relation to the management of the principal's property and financial affairs, and to health-care decisions, "did not give [the attorney-in-fact] a sort of universal authority beyond those express provisions." *Id.* at 592. Citing to *Rice v. Floyd*, 768 S.W.2d 57, 58 (Ky. 1989), we said "an agent's authority under a power of attorney is to be construed with reference to the types of transaction expressly authorized in the document[.]" *Id.*; *see also Restatement (Second) of Agency* § 37(1) (1958) ("Unless otherwise agreed, general expressions used in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates."). It is self-evident that the power relied upon here by Extendicare relates to the conduct of Adams' financial and banking

affairs, and not to the vindication of unanticipated causes of action that might arise in the future.

In summary, we agree with the Trigg Circuit Court and the Court of Appeals that Whisman was not authorized by her father to enter into Extendicare's arbitration agreement. Adams cannot therefore be deemed to have given his assent to the agreement, and in the absence of that assent there was not a valid agreement to be enforced.

### 2. The Wellner POA

In support of its argument that Beverly Wellner was authorized to execute on Joe's behalf the Kindred arbitration agreement, Kindred relies upon two provisions of the Wellner POA: 1) the power "to demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor)"; and, 2) the power "to make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance."

**a.** **The power "to demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor)" does not confer the authority to enter in a pre-dispute arbitration agreement.**

██ Kindred acknowledges that this provision of the Wellner POA granting the power to "demand, sue for, collect, recover and receive all ... demands whatsoever" and "to institute legal proceedings" did not expressly authorize Beverly to sign the pre-dispute arbitration agreement. In-

stead, Kindred argues that such authorization must be implied because arbitration is "reasonably necessary or incidental," as Kindred puts it, to "the ability to settle suits that have been brought pursuant to Joe's intended grant of authority." Kindred argues, "it would be an absurd result to recognize an agent's power to bring suit ... and then deny that she has the power to settle those very claims." We do not disagree; but "arbitrating" is not "settling."

An agent charged with the responsibility of managing a claim in litigation would ordinarily need the ability to settle the claim. But, as we said above in reference to the *Whisman* case, initiating an arbitration proceeding—or more precisely, entering into a pre-dispute arbitration agreement, is a far cry from "settling" a claim. Initiating arbitration is the commencement of a legal battle; settling a claim is the resolution of a legal battle. A pre-dispute arbitration agreement "settles" nothing in relation to present and future claims of the principal.

**b.** **The power "to make ... contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance does not confer the authority to enter into a pre-dispute arbitration agreement applicable to future personal injury claims."**

██ Kindred next contends that Beverly was authorized to provide Joe's assent to the arbitration agreement because it gave her the power "to make ... contracts of *every nature in relation to both real and personal property*, including stocks, bonds, and insurance." (emphasis added). We certainly agree that a personal injury claim is a chose-in-action, and therefore constitutes personal property. Kentucky has long acknowledged that "choses in ac-

tion are personal property." *Button v. Drake*, 302 Ky. 517, 195 S.W.2d 66, 69 (1946).

In *Button*, our predecessor court examined several definitions of "property" from a variety of sources, this being, perhaps, the broadest one, taken from *Commonwealth v. Kentucky Distilleries & Warehouse Co.*, 136 S.W. 1032, 1037 (Ky.1911):

> The term (property) is therefore said to include everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal, choses in action as well as in possession, *everything which has an exchangeable value, or which goes to make up one's wealth or estate.*

(emphasis added).

The Court in *Button* also cites to this definition from *Trimble v. City of Mt. Sterling*, 12 S.W. 1066, 1067 (Ky. 1890): "The words 'personal property' mean money, goods, chattels, things in action, and evidences of debt." *Button*, at 69.

Joe's personal injury claim was personal property and Beverly had the authority to make contracts relating to it. But the Kindred pre-dispute arbitration agreement was not a contract made "in relation" to a property claim. The agreement did *nothing* to affect any of Joe's property or his property rights. The arbitration agreement does not even purport to be a "contract ... in relation to both real and personal property." As clearly expressed within the agreement itself,[14] the agreement was made in relation to Joe's constitutional right to access the courts and to trial by jury. Constitutional rights are decisively *not* "personal property" as we have defined the term. They are not "money, goods, chattels, things in action,

and evidences of debt;" nor do they have "an exchangeable value, or which goes to make up one's wealth or estate."

Beverly's authority to deal with Joe's real and personal property does not translate into the power to relinquish his constitutional rights. Consequently, we conclude that Beverly was not authorized to provide Joe's assent to an agreement waiving his constitutional rights by committing his future personal injury claims to arbitration.

### 3. The Clark POA

Kindred argues that Janis Clark was expressly authorized to enter into its pre-dispute arbitration agreement on behalf of her mother, Olive, by virtue of the language of the POA providing Janis with the power "[t]o draw, make, and sign in my name any and all checks, promissory notes, contracts, deeds or agreements; ... and Generally to do and perform for me and in my name all that I might do if present;" and "[t]o *institute or defend suits concerning my property or rights.*"

### a. The power "to institute or defend suits concerning my property rights" does not confer the authority to enter in a pre-dispute arbitration agreement.

For the reasons cited in the foregoing analysis of the "institute or defend suits" provisions of the Adams–Whisman POA and the "institute legal proceedings" of the Wellner POA, we conclude that this provision, granting the power "to institute or defend suits concerning my property rights," cannot be construed as supporting the authority for the attorney-in-fact to sign a predispute arbitration agreement

---

14. The Kindred arbitration agreement states: "Binding arbitration means the parties are waiving their right to trial, including their right to a jury trial, their right to a trial by a Judge, and their right to appeal the decision of the arbitrator(s)."

binding the principal and his estate to arbitrate future personal injury claims.

### b. The powers to "to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way[.]" and "[g]enerally to do and perform for me in my name all that I might if present" are broad enough and clear enough, unless otherwise prohibited, to encompasses the signing of a pre-dispute arbitration agreement.

In *Ping*, we reiterated the general rule that an express authorization in a power-of-attorney document for an attorney-in-fact to engage in specified activities implies that acts "reasonably necessary" to the specified activity are also authorized. 376 S.W.3d at 594. We cautioned, however, with reference to *Restatement (Third) of Agency* § 2.02 comment h. (2006), that given the "significant legal consequences" arising from an agreement waiving the principal's rights of access to the courts and to trial by jury, "authority to make such a waiver is not to be inferred lightly." *Id.* at 593. Our holdings throughout this opinion, as in *Ping* itself, serve to highlight our reservation about casually inferring a power laden with such consequences.

However, a literal comprehension of the extraordinarily broad grant of authority expressed by these provisions—"to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way" and "to do and perform for me in my name all that I might if present"— requires no inference about what the scope of authority encompassed within the expressed power. One might entertain considerable doubt about whether Olive consciously intended to forfeit her right of access to the courts and to a jury trial, but the language of her POA encompasses that result regardless of Olive's actual intent.

Given this extremely broad, universal delegation of authority, it would be impossible to say that entering into a pre-dispute arbitration agreement was not covered.

### D. Summary

In summation, we conclude that Clark POA's universal grant of authority, while not expressly providing the authority to bind the principal to an arbitration agreement, it implicitly does so. The more limited grants of authority provided in the Adams–Whisman POA and the Wellner POA do not provide the attorneys-in-fact with that authority. Based upon these conclusions, we affirm at this point the order of the Court of Appeals in *Extendicare Homes, Inc., et al, v. Whisman* (Case No. 2013–SC–426–I).

However, our analysis continues because, in *Kindred Nursing Centers Limited Partnership, et al, v. Wellner* (Case No. 2013–SC–431–I) and *Kindred Extendicare Homes, Inc., et al. v. Clark* (Case No. 2013–SC–426–I), we must further consider the additional issue of whether the trial court had jurisdiction to enter an order pursuant to CR 60.02 vacating the earlier dismissal. With respect to *Kindred Extendicare Homes, Inc., et al. v. Clark*, as well as the other cases, we also consider the extent to which the authority of an agent to waive his principal's fundamental constitutional rights to access the courts, to trial by jury, and to appeal to a higher court, can be inferred from a less-than-explicit grant of authority.

## IV. AN AGENT'S AUTHORITY TO WAIVE HIS PRINCIPAL'S CONSTITUTIONAL RIGHT TO ACCESS THE COURTS AND TO TRIAL BY JURY WILL NOT BE INFERRED BUT MUST BE CLEARLY EXPRESSED BY THE PRINCIPAL

In the cases before us we address the question of whether a person will be

deemed to have waived fundamental constitutional rights when, in his stead, his attorney-in-fact signed a pre-dispute arbitration agreement. Our focus has been, and remains, upon the scope of the powers expressed in the power-of-attorney document, and whether those expressed powers are sufficient to supply the principal's assent needed to form an agreement, which on its face, forfeits those fundamental constitutional rights.

Upon review of these cases, we are convinced that the power to waive generally such fundamental constitutional rights must be unambiguously expressed in the text of the power-of-attorney document in order for that authority to be vested in the attorney-in-fact. The need for specificity is all the more important when the affected fundamental rights include the right of access to the courts (Ky. Const. § 14),[15] the right of appeal to a higher court (Ky. Const. § 115),[16] and the right of trial by jury, which incidentally is the *only* thing that our Constitution commands us to "hold sacred." *See* Ky. Const. § 7 ("The ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate, subject to such modifications as may be authorized by this Constitution."). . . .

There are limits to what we will infer from even the broadest grants of authority that might be stated in a power-of-attorney instrument. Lest there be any doubt concerning the propriety of drawing a line that limits the tolerable range of inferences we would allow from such a universally broad grant as that contained in the Clark POA, it is worth considering how we

would react when other fundamental rights are at stake.

It would be strange, indeed, if we were to infer, for example, that an attorney-in-fact with the authority "to do and perform for me in my name all that I might if present to make any contracts or agreements that I might make if present" could enter into an agreement to waive the principal's civil rights; or the principal's right to worship freely; or enter into an agreement to terminate the principal's parental rights; put her child up for adoption; consent to abort a pregnancy; consent to an arranged marriage; or bind the principal to personal servitude. It would, of course, be absurd to infer such audacious powers from a non-specific, general, even universal, grant of authority. So too, it would be absurd to infer from a non-specific, universal grant, the principal's assent to surrender of other fundamental, *even sacred,* liberties.

In this vein, we would not seriously entertain the claim that an agent had the implied power to enter a plea agreement pleading his principal guilty to a criminal offense. We are not aware of any other circumstances in which a generic grant of authority to make contracts or to do "whatever I might do if present," would be deemed to imply a conscious decision to forego fundamental constitutional rights. Absent a clearly expressed, knowing, and voluntary waiver, we do not conclude that an individual has waived his constitutional right to remain silent in the face of police questioning; to have the assistance of counsel during a trial; to plead guilty to a crime and thereby waive his right to a trial. *See Brady v. United States,* 397

---

**15.** "All courts shall be open, and every person for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

**16.** "In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court."

U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747, (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.").

Without any doubt, one may expressly grant to his attorney-in-fact the authority to bargain away his rights to access the courts and to trial by jury by entering into a pre-dispute arbitration agreement. No one challenges that; we accept such authorized waivers often in the context of criminal cases. We will not, however, infer from the principal's silence or from a vague and general delegation of authority to "do whatever I might do," that an attorney-in-fact is authorized to bargain away his principal's rights of access to the courts and to a jury trial in future matters as yet not anticipated or even contemplated. A durable power-of-attorney document often exists long before a relationship with a nursing home is anticipated. It bears emphasis that the drafters of our Constitution deemed the right to a jury trial to be *inviolate*, a right that cannot be taken away; and, indeed, a right that is *sacred*, thus denoting that right and that right alone as a divine God-given right.

■ It is argued that the power-of-attorney documents we see in this case would endow the attorneys-in-fact with the authority to waive any and all constitutional rights of his principal as he may deem proper, at least insofar as the waiver can be effectuated by a "contract" or an "agreement." However, as illustrated by our decision in *Ping*, it is fundamental that we will not read provisions into a contract that were not put there by the principal.

We held in *Rice v. Floyd*, 768 S.W.2d 57, 59 (Ky. 1989), that even a "comprehensive" durable power-of-attorney would not be construed to implicitly authorize *any* and all decisions a guardian might make on behalf of his ward. Infusing the authority to enter into "any contract or agreement" with the authority to waive fundamental constitutional rights eviscerates our long line of carefully crafted jurisprudence dictating that the principal's explicit grant of authority delineated in the power-of-attorney document is the controlling factor in assessing the scope of the powers of the attorney-in-fact.

It makes no difference that arbitration clauses are commonplace in nursing home contracts and that a principal might anticipate that someday his agent will act to admit him into one. This reality does not vitiate our conclusion that to cloak the agent with authority to waive the fundamental right to an adjudication by judge or jury, the power-of-attorney document must expressly so provide. The inclusion of such a provision, when it comports with the principal's intent and expectation, would be no burden.

■ The FAA provides that a "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*." 9 U.S.C. § 2 (emphasis added). As noted above, the question of whether an arbitration agreement was ever formed is a matter of state law, "so long as the state law in question does not single out arbitration agreements." *See Bluegrass Powerboats*, 424 S.W.3d at 907; and *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009) (State law is applicable to determine which contracts are binding and enforceable under the FAA "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally....." *quoting Perry v. Thomas,*

482 U.S. 483, 493, n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)).

▮ Pursuant to our holding in *Ping,* an arbitration "agreement" entered into by an attorney-in-fact which exceeds the grant of authority conferred by his principal is no agreement at all. This principle derives from the general principles of law and equity that an attorney-in-fact may not act beyond the powers he has been granted under the power-of-attorney instrument. It follows that there are specific and concise grounds as exist at law or in equity, applicable to the formation of contracts generally, for establishing the invalidity of the three arbitration agreements at issue because each of them was signed by an agent lacking his principal's authority to bargain away fundamental constitutional rights. Neither the KUAA nor the FAA is offended by that principle.

We are, of course, well aware that arbitration is not only sanctioned, but indeed promoted, by the Kentucky Constitution. Section 250 states: "It shall be the duty of the General Assembly to enact such laws as shall be necessary and proper to decide differences by arbitrators, the arbitrators to be appointed by the parties who may choose that summary mode of adjustment." This Constitutional endorsement of arbitration does not vitiate the elementary rule that an attorney-in-fact may not waive his principal's fundamental constitutional rights absent an explicit power to do so. Nor does § 250 in any way reduce the power and force of § 7 deeming the right to a jury trial to be inviolate and sacred. The operative phrase of § 250 is that the parties "*may choose*" this mode of dispute resolution, signifying that waiving one's right to trial by judge or jury is his personal *choice*. In the circumstances we address, the principals did not "*choose*" this mode of adjustment; neither did they *choose* the corresponding waiver of their

sacred right to a jury trial. More importantly, they did not authorize their respective attorneys-in-fact to "choose" it for them.

We reject the notion that this holding conflicts with the decisions of the United States Supreme Court in *Marmet Health Care Center, Inc. v. Brown,* —— U.S. ——, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012), and *AT & T Mobility LLC v. Concepcion,* 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). *Concepcion* struck down a California doctrine that explicitly declared unconscionable, and thus unenforceable, all arbitration clauses in consumer contracts containing class action waivers. The Supreme Court held that "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." *Id.* at 1747. To the contrary, our holding does not prohibit arbitration of any "particular type of claim." Consistent with *Concepcion* and the FAA's requirement for the existence of a valid arbitration agreement, we decline to compel arbitration *only* when the assent of a party, purportedly bound by the agreement, has not been validly obtained. Nursing home facilities may still enforce arbitration agreements with their residents when the resident has signed the agreement or validly authorized his agent to sign in his stead.

*Marmet* applied the rule of *Concepcion* to strike down West Virginia's explicit policy of refusing to enforce any "arbitration clause in a nursing home admission agreement adopted prior to an occurrence of negligence that results in a personal injury or wrongful death." *Marmet,* 132 S.Ct. at 1203. Before *Marmet,* a pre-dispute arbitration clause between a nursing home and a resident could not be enforced in West Virginia to compel arbitration of *any* claim based upon personal injury or wrongful

death. Our rule does nothing that even approaches that kind of restraint on arbitration. We simply require, as we do with any contract, that the parties to be bound by the agreement validly assented. Nursing home residents may still enter into pre-dispute arbitration agreements and those agreements will be enforced, like any contract, if the agreement of the persons to be bound thereby has been obtained, either directly in person or by a duly authorized agent. We say only that an agent's authority to waive his principal's constitutional right to access the courts and to trial by jury must be clearly expressed by the principal.

A straight-forward application of our rule that an attorney-in-fact cannot act beyond the powers granted in the power-of-attorney document stands in stark contrast to the blanket prohibitions against arbitration agreements condemned in *Marmet* and *Concepcion.* Whatever hostility our rule evinces is not against the federal policy favoring arbitration; indeed, Kentucky shares that same policy, as we have proclaimed on several occasions.[17] Our rule merely reflects a long-standing and well-established policy disfavoring the unknowing and involuntary relinquishment of fundamental constitutional rights regardless of the context in which they arise.

## V. THE CLARK CIRCUIT COURT HAD JURISDICTION PURSUANT TO CR 60.02 TO GRANT RELIEF FROM ITS ORDER COMPELLING THE PARTIES TO SUBMIT THE CONTROVERSIES TO ARBITRATION

■ This issue affects only the two cases originating in the Clark Circuit Court: *Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation v. Wellner* (Case No. 2013–SC–431–I) and *Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation v. Clark* (Case No. 2013–SC–430–I); it does not involve *Extendicare Homes, Inc. d/b/a Shady Lawn Nursing Home v. Whisman* (Case No. 2013–SC426–I).

Upon its initial consideration of the *Clark* and *Wellner* cases, in January 2012, the Clark Circuit Court granted Kindred's motions to dismiss the cases and compel the parties to submit the pending claims to arbitration. Although not expressly designated as final and appealable orders, the circuit court's orders were, by all indications, final.

CR 60.02 provides that upon specified grounds,[18] a trial court "may, upon terms as are just, relieve a party ... from its final judgment, order, or proceeding[.]"

---

17. For example: *Louisville Peterbilt, Inc. v. Cox,* 132 S.W.3d 850, 854 (Ky. 2004) ("Kentucky and national policy have generally favored agreements to arbitrate."); *Ally Cat, LLC v. Chauvin,* 274 S.W.3d 451, 457 (Ky. 2009) ("We do not, by this opinion, signify any retreat from our recognition of the prevalent public policy favoring enforcement of agreements to arbitrate."); *Schnuerle v. Insight Communications Co., L.P.,* 376 S.W.3d 561, 577 (Ky. 2012) ("[O]ur state Constitution and statutes favor the enforceability of arbitration agreements.").

18. The grounds stated by CR 60.02 are: (a) mistake, inadvertence, surprise or excusable neglect; (b) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59.02; (c) perjury or falsified evidence; (d) fraud affecting the proceedings, other than perjury or falsified evidence; (e) the judgment is void, or has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (f) any other reason of an extraordinary nature justifying relief.

After the September 2012 rendition of our opinion in *Ping*, counsel for Clark and Wellner moved the Clark Circuit Court for relief pursuant to CR 60.02 from the January orders compelling arbitration, citing the greater elucidation of the subject provided by *Ping* as cause.

The trial court was sufficiently moved by the argument such that it exercised its authority to grant relief from the final judgment and reconsider the issue, resulting in its ultimate decision to overrule Kindred's motions to dismiss and compel arbitration. Kindred argues that the trial court lacked jurisdiction for its action. Clearly, CR 60.02 vests the trial court with the jurisdiction to act.

Motions under CR 60.02 are addressed to the sound discretion of the trial court. *See Fortney v. Mahan*, 302 S.W.2d 842, 843 (Ky. 1957), citing *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242 (3rd Cir. 1951). We review trial court decisions under CR 60.02 for abuse of discretion. "Given the high standard for granting a CR 60.02 motion, a trial court's ruling on the motion receives great deference on appeal. . . ." *Barnett v. Commonwealth*, 979 S.W.2d 98, 102 (Ky. 1998) (citing *Brown v. Commonwealth*, 932 S.W.2d 359, 361 (Ky. 1996)). To amount to an abuse of discretion, the trial court's decision must be "arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). We are unable to conclude that the trial judge abused her discretion in her consideration of the respective CR 60.02 motions.

## VI. CONCLUSION

Based upon the forgoing analysis, we affirm the orders of the Court of Appeals insofar as they deny the requests for interlocutory relief. It is hereby ORDERED as follows:

1) The CR 65.09 motion of Extendicare Homes, Inc., *et al.*, in Case No. 2013–SC–426–I for interlocutory relief compelling arbitration is DENIED, based upon our conclusions that the powers vested in Belinda Whisman did not encompass the power to enter into an arbitration agreement regarding the claims of the decedent, Van Buren Adams, and because the authority to waive Adams' constitutional rights of access to the courts by judge or jury and to appeal to a higher court was not explicitly set out in the power-of-attorney document, and because Whisman was not authorized to enter into an arbitration agreement on behalf of the wrongful death beneficiaries;

2) The CR 65.09 motion of Kindred Extendicare Homes, Inc., *et al.*, in Case No. 2013–SC–426–I is DENIED, based upon our conclusion that the authority to waive Olive Clark's constitutional rights of access to the courts by judge or jury and to appeal to a higher court was not explicitly set out in the power-of-attorney document, and because Janis Clark was not authorized to enter into an arbitration agreement on behalf of the wrongful death beneficiaries;

3) The CR 65.09 motion of Kindred Nursing Centers Limited Partnership, *et al.*, in Case No. 2013–SC–431–I for interlocutory relief compelling arbitration is DENIED, based upon our conclusions that the powers vested in Beverly Wellner did not encompass the power to enter into an arbitration agreement regarding the claims of the decedent, Joe Wellner, and because the authority to waive Joe Wellner's constitutional rights of access to the courts by judge or jury and to appeal to a higher court was not explicitly set out in the power-of-attorney document, and because Beverly Wellner was not authorized to enter into an arbitration agreement on behalf of the wrongful death beneficiaries.

Barber, Cunningham, and Keller, JJ., concur. Abramson, J., dissents by separate opinion in which Minton, C.J. and Noble, J., join. Noble, J., dissents by separate opinion in which Minton, C.J., joins.

## ABRAMSON, J., DISSENTING:

Relying on a "God-given right" to a jury trial, the majority announces a new rule that contravenes the United States Constitution and controlling precedent from the Supreme Court of the United States. To posit that the right to a jury trial is the preeminent right in our Kentucky Constitution (apparently superior to the rights that precede it in that document including, for example, the rights to life, liberty, religious freedom, assembling for the common good, and acquiring property) and, accordingly, prohibit an agent acting under an unrestricted general "power to contract" from entering into an arbitration agreement is at best seriously misguided. For the reasons stated herein, I strongly dissent.[19]

Although arbitration has been constitutionally based in Kentucky since 1799 and both federal and state statutes evince a legislative policy favoring arbitration, the existence of a binding agreement to arbitrate is necessarily a threshold consideration for a trial court faced with a motion to compel arbitration. Disposition of that issue, as both the United States Supreme Court and this Court have long recognized, implicates state law contract principles. In *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581 (Ky. 2012), this Court deemed an arbitration agreement signed by Ms. Ping upon her mother's admission to a nursing home unenforceable because the authority granted Ms. Ping in her mother's durable power of attorney did not

extend to entering into an optional contract for arbitration. The three cases consolidated for the Court's consideration today similarly involve the scope of an agent's authority under a power of attorney executed pursuant to Kentucky law and, more specifically, whether the agent is authorized to execute an arbitration agreement on behalf of his or her principal. As in *Ping*, each agent's authority is necessarily derived from the power of attorney instrument executed by his or her principal. Not surprisingly, the three separate power of attorney instruments at issue contain differing language and require individual analysis. However, the underlying principles of state and federal law are the same in each case. Despite these principles, the majority has created a newly found rule that an agent cannot "waive" a principal's constitutional right to a jury trial unless the power of attorney contains a "specific" and "express" statement to that effect and, in doing so, the majority has wrought a change in Kentucky law—a significant change with potentially disruptive implications far beyond the relatively narrow confines of these nursing home admission cases. Furthermore, the majority has worked this change in apparent disregard of the Federal Arbitration Act (FAA) and numerous decisions by the United States Supreme Court invalidating under the FAA any State rule meant to hinder the enforcement of arbitration agreements.

## RELEVANT FACTS

### *Extendicare Homes, Inc. d/b/a Shady Lawn Nursing Home v. Whisman and Adams, 2013–SC–426–I.*

On February 21, 2011, Van Adams executed a "General Power of Attorney–Dura-

---

19. However, I do concur in the majority's adherence to our holdings in *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581 (Ky. 2012), and *Pete v. Anderson*, 413 S.W.3d 291 (Ky. 2013), that the wrongful death claims are distinct from the claims of the various estates. As the parties note, however, that question is not before us.

ble" granting certain powers and authority to his daughter Belinda Whisman. The Whisman Power of Attorney stated in relevant part:

I, VAN BUREN ADAMS ... constitute and appoint my daughter, BELINDA WHISMAN, ... my true and lawful attorney-in-fact, with full power for me and in my name and stead, to make contracts, lease, purchase, sell, encumber, or convey any real or personal property that I may now or hereafter own, to receive and receipt for money which may now or hereafter be due to me, to retain or release all liens on real or personal property, to draw, make and sign any and all checks, contracts, notes, mortgages, agreements, or any other document including state and Federal tax returns; to invest or reinvest my money for me; to institute or defend suits concerning my property or rights, . . . .

Shortly thereafter, on March 1, 2011, Adams entered Shady Lawn Nursing Home where he resided until his death on May 19, 2011. In April, 2012, Whisman and Tony Adams, as co-administrators of Adams's estate, brought suit against various defendants which owned and operated the nursing home facility (collectively referred to herein as Extendicare) for negligence, violation of the Long Term Care Resident's Rights statute, Kentucky Revised Statute (KRS) 216.510 *et seq.*, and wrongful death. In a motion to dismiss or to compel arbitration, Extendicare sought enforcement of an optional Alternative Dispute Resolution Agreement (the Extendicare Arbitration Agreement), which "Belinda Whisman POA" had executed along with several other documents at the time she admitted her father to the facility. The Arbitration Agreement stated in bold font, all-capital letters that it was "not a condition of admission to or continued residence in the center" and that by signing

the parties were "giving up their constitutional right to have their disputes decided by a court of law or to appeal any decision or award of damages resulting from the alternative dispute resolution process, except as provided herein." The resident could revoke the Agreement within thirty days of signing it. The "covered disputes" subject to the Extendicare Arbitration Agreement included contract, negligence and fraud claims, statutory violations and other cognizable causes of action arising from the resident's stay in the facility.

Addressing the motion to compel arbitration, the Trigg Circuit Court concluded that Extendicare had made a prima facie showing regarding the existence of an arbitration agreement signed by Whisman but nonetheless denied arbitration. The circuit court reasoned that although the Whisman Power of Attorney had language distinct from, and more germane than, that construed in *Ping*, it was difficult to distinguish the case from the rationale adopted by this Court in *Ping*. Extendicare sought relief from the order denying arbitration in the Court of Appeals pursuant to Kentucky Rule of Civil Procedure (CR) 65.07, but that relief was denied. The matter is now before this Court for review under CR 65.09 with Extendicare maintaining that the Arbitration Agreement is enforceable in light of the language of the Whisman POA and controlling state and federal law.

***Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation v. Clark, 2013–SC–430–I.***

The second appeal to reach this court involves a "General Durable Power of Attorney to Conduct All Business and Personal Affairs of Principal" executed by Olive G. Clark in favor of her daughter, Janis

Clark, on August 31, 2006. The Clark POA provides in relevant part:

> I, OLIVE G. CLARK, ... hereby constitute and appoint my daughter, JANIS ELAINE CLARK ... my true and lawful attorney in fact, with full power for me and in my name, place, and stead, in her sole discretion, to transact, handle, and dispose of all matters affecting me and/or my estate in any possible way. Without limiting or derogating from this general power, I specifically authorize my attorney in fact for me and in my name, place, and stead, in her sole discretion:
>
> To prepare and complete administrative documents necessary to secure or preserve any and all governmental benefits available to me;
>
> To lease, sell, or convey any real or personal property that I may now or ever own;
>
> To mortgage my property as she sees fit;
>
> To receive and receipt for any money which may now or hereafter be due to me;
>
> To retain and release all liens on real or person property;
>
> To draw, make, and sign in my name any and all checks, promissory notes, contracts, deeds or agreements;
>
> To invest or reinvest my money for me;
>
> To institute or defend suits concerning my property or rights;
>
> To file all tax returns (including, without limitation, state and federal income tax returns;
>
> To enter all safe deposit boxes;
>
> To transfer assets of mine to any trust created by me for addition to trust principal; and
>
> Generally to do and perform for me and in my name all that I might do if present.

> Also, without limiting or derogating from this general power, I authorize my attorney in fact to make all decisions regarding my health care and medical treatment.

Olive Clark was a resident of Winchester Centre for Health and Rehabilitation from August 16, 2008 until March 30, 2009 and died on April 4, 2009. In June, 2010, Janis Clark as executrix of her mother's estate and on behalf of the wrongful death beneficiaries brought suit against the owners and operators of Winchester Centre (collectively Kindred) alleging negligence, violations of the Long Term Care Resident's Rights statute, KRS 216.510 *et seq.*, and wrongful death. Kindred filed a motion to dismiss the case or, alternatively, to stay it pending arbitration pursuant to the "Alternative Dispute Resolution Agreement Between Resident and Facility (Optional)" executed by "Janis Clark POA" on August 15, 2008. This document (the Kindred Arbitration Agreement) provided that all claims and controversies arising from the agreement or the resident's stay at the facility, including contract, tort, breach of statutory duties and other causes of action would be resolved under the agreement. The agreement stated in the first paragraph: "Binding arbitration means that the parties are waiving their right to a trial, including their right to a jury trial, their right to trial by a Judge and their right to appeal the decision of the arbitrator(s)." In the final paragraph entitled "Resident's Understanding of Agreement," the resident (or her representative) acknowledged that the Kindred Arbitration Agreement was optional, that the resident had the right to seek legal counsel and that the agreement could be revoked within thirty days of signing by the resident or her representative.

Kindred filed a motion to compel arbitration, and in January 2012 the Clark

Circuit Court issued an order dismissing the action and referring the parties to arbitration. In September 2012, after an arbitration proceeding was scheduled, Clark moved the circuit court to vacate its prior order pursuant to CR 60.02. Following oral argument, the trial court entered a new order in November 2012 vacating its prior order on the grounds that Janis Clark lacked authority to enter the Arbitration Agreement under the principles outlined by this Court in *Ping*. Kindred sought relief in the Court of Appeals pursuant to CR 65.07, but that court denied relief due to its own construction of *Ping*. The matter is now before this Court pursuant to CR 65.09 with Kindred primarily contending that the Clark Circuit Court erred in denying arbitration but also insisting that the circuit court lost jurisdiction when it dismissed the case for arbitration in January 2012, rendering invalid any attempt to revive or reassume jurisdiction later that year.

***Kindred Nursing Centers Limited Partnership d/b/a Winchester Centre for Health and Rehabilitation v. Wellner, 2013-SC-431-I.***

The third case has many similarities with the *Clark* litigation. It involves the same facility, Winchester Centre for Health and Rehabilitation; the same Kindred Arbitration Agreement; the same legal claims asserted against the same Kindred defendants; the same counsel of record; the same judge of the Clark Circuit Court; and the same procedural history to the extent there was a January 2012 order dismissing the case and compelling arbitration followed by a November 2012 order vacating the order of arbitration. In this case, Joe Paul Wellner granted a "Power of Attorney" to his wife, Beverly M. Wellner, on May 15, 2008. Three months later, on August 16, 2008, Mr. Wellner entered the Winchester Centre where he resided until June 15,

2009. Following Mr. Wellner's June 19, 2009 death, Mrs. Wellner brought a lawsuit asserting the above-referenced claims on behalf of her husband's estate and the wrongful death beneficiaries. The power of attorney pursuant to which Mrs. Wellner executed the Kindred Arbitration Agreement, while a durable power of attorney, was somewhat different than the Whisman and Clark POAs. It provided in relevant part:

That I, JOE PAUL WELLNER, … hereby make, constitute and appoint my wife, BEVERLY M. WELLNER, as my true and lawful Attorney-in-Fact for me and in my name, place and stead:

1. To receive, take receipt for, and hold in possession, manage and control all property, both real and personal, which I now or may hereafter own, hold, possess or be or become entitled to with full power to sell, mortgage or pledge, assign, transfer, invest and reinvest the same or any part thereof in forms of investment, including bonds, notes and other obligations of the United States deemed prudent by my said wife in her discretion, with full power to retain the same without liability for loss or depreciation thereof.

2. To demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefor).

3. To make, execute, deliver and endorse notes, drafts, checks and order for the payment of money or other property from or to me or order in my name.

4. To make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance.

5. To have access to my safe deposit boxes, act as my proxy with power of substitution to vote all stocks or securities in my name in relation to any individual or corporate action, to deposit any stocks or securities in connection with any plans of prospective or reorganization committees, to accept and exercise all rights, to subscribe for securities and to sell same.

6. To receive and receipt for all rents and income to which I am or may become entitled, pay therefrom all necessary expenses for the maintenance, upkeep, care and protection of my property, deduct therefrom her own reasonable compensation, and pay the net income from time to time to me or in such manner as I shall direct, or in the absence of such payment to me or at my discretion, to invest the same for me in her judgment in the manner above described.

7. To prepare, execute and file federal or state income tax returns and other real and personal property tax lists and to pay all such taxes.

8. In the event of my illness, incapacity or other emergency to have full power to make all health care decisions for me and in my stead; this power shall encompass the power to make any decision which I might myself make in authorizing or refusing treatment, surgery or other health care. My Attorney-in-Fact shall have the right to refuse the administration of nutrition and hydration.

9. If I should every need a guardian or curator or similar person or entity to assist me if I am unable to fully handle all of my affairs, and if this Power of Attorney should not be sufficient therefor, I nominate my wife, BEVERLY M. WELLNER, as my guardian, curator, etc., and I specifically provide that surety not be required on her bond as such.

10. I hereby further grant unto my Attorney-in-Fact full power in and concerning the above premises and to do any and all acts as set forth above as fully as I could do if I were personally present, and at my decease to pay, transfer and deliver over to my personal representative, all principal and income then in his possession and control, and I do ratify and confirm whatever my said Attorney-in-Fact shall lawfully do under these presents, provided however, that my attorney shall not bind me as surety, guarantor for accommodation nor give away any of my estate, whatsoever, nor shall my attorney be authorized to accept service of process for or on my behalf....

As with the other two cases, the *Wellner* case is before the Court pursuant to CR 65.09, the Court of Appeals having denied relief under CR 65.07. Kindred raises the same issue raised in *Clark* regarding the circuit court's inability to reassert jurisdiction once the case was dismissed and ordered to arbitration but focuses primarily on the substantive issue regarding the enforceability of the Kindred Arbitration Agreement pursuant to state and federal law.

## ANALYSIS

Arbitration as a means of dispute resolution in the Commonwealth dates back to at least 1799 when the drafters of Kentucky's Second Constitution included in Article VI. § 10 a duty on the part of the General Assembly to "pass such laws as shall be necessary and proper to decide differences by arbitrators." All subsequent versions of our state constitution, continuing to the present one adopted in 1891, have contained this language, Ky. Const. § 250, and the General Assembly has fulfilled its duty by adopting the Uniform Arbitration Act, KRS 417.045 *et seq.* The arbitration

agreements in all three cases before the Court provide that the Kentucky Arbitration Act shall govern, with the Kindred Arbitration Agreements in *Clark* and *Wellner* specifically invoking KRS 417.145 *et seq.*, and the Extendicare Arbitration Agreement invoking the law applicable in the state where the particular nursing facility is located. All three agreements also provide that in the event our state statute does not apply then the Federal Arbitration Act will govern.

Despite the invocation of our state arbitration act in the parties' agreements, only the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, is ultimately applicable in each of these cases. The Kentucky Arbitration Act cannot apply because none of the agreements comply with the Act as explained in *Ally Cat LLC v. Chauvin*, 274 S.W.3d 451 (Ky. 2009), by specifying that arbitration occur in Kentucky. This inapplicability renders the FAA controlling pursuant to the express terms of the contracts. In any event, as we recognized in *Ping*, the Federal Act applies to arbitration provisions in contracts "evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2. With the United States Supreme Court having deemed health care a form of economic activity involving interstate commerce, state and federal courts across the country, including this one, have recognized that nursing home admission contracts are subject to the FAA. *Ping*, 376 S.W.3d at 589–90. *See also, Dean v. Heritage Healthcare of Ridgeway, LLC*, 408 S.C. 371, 759 S.E.2d 727, 732–33 (2014); *Miller v. Cotter*, 448 Mass. 671, 863 N.E.2d 537 (2007).

Under the FAA, it is incumbent upon the party seeking to compel arbitration to establish the existence of a valid arbitration agreement. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Section 2 of the FAA provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." In determining whether an enforceable agreement exists, "state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). *See also Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009) (existence of an enforceable agreement to arbitrate necessarily depends on state law rules of contract formation). Here, as in *Ping*, the primary issue is whether an agent acting under a particular power of attorney was authorized to enter into an arbitration agreement on behalf of his or her principal.

Before turning to principles of Kentucky agency law and the specific terms of the three power of attorney instruments at issue in these cases, I note that CR 65.07 and CR 65.09 are the proper procedural vehicles for appellate review of trial court orders denying motions to compel arbitration, especially where, as here, the interlocutory appeal provision of the Kentucky Arbitration Act, KRS 417.220, is not applicable because only the FAA applies. *North Fork Collieries, LLC v. Hall*, 322 S.W.3d 98, 101 (Ky. 2010). I further note that the proper construction of a power of attorney instrument is a matter of law which this Court reviews de novo. *Ping*, 376 S.W.3d at 590.

Kentucky has long recognized that a power of attorney should be strictly construed in conformity with the principal's purpose. *Harding v. Kentucky River Hardwood Co.*, 205 Ky. 1, 265 S.W. 429, 431 (1924). Consistent with this strict construction, our Court has held that "powers

of attorney delegating authority to perform specific acts, and also containing general words, are limited to the particular acts authorized." *Id. citing U.S. Fidelity Co. v. McGinnis*, 147 Ky. 781, 145 S.W. 1112 (1912). In *Ping*, we applied these age-old principles to the particular power of attorney at issue and concluded that the agent did not have authority to enter into an arbitration agreement on behalf of her principal.

The power of attorney in *Ping* was labeled a "General Power of Attorney" and began by granting authority to the agent "to do and perform any, all, and every act and thing *whatsoever requisite and necessary to be done*, to and for all intents and purposes, as I might or could do if personally present, including but not limited to the following ..." (emphasis supplied). As we stated in our opinion:

The document then specifically authorized several acts pertaining to the management of Mrs. Duncan's property and finances, such as "tak[ing] possession of any and all monies, goods, chattels, and effects belonging to me, wheresoever found; ... receiv[ing], deposit[ing], invest[ing] and spend[ing] funds on my behalf, ... tak[ing] charge of any real estate which I may own in my own name or together with other owners, legally or equitably, and to mortgag[ing], convey[ing] or sell[ing] said real estate and perform[ing] any acts necessary to mortgage, convey or sell said real estate." The document also authorized Ms. Ping "[t]o make any and all decisions of whatever kind, nature or type regarding my medical care, and to execute any and all documents, including, but not limited to, authorizations and releases, related to medical decisions affecting me; and [t]o generally do any and every further act and thing of whatever kind, nature, or type required to be done on my behalf."

Finally, Mrs. Duncan declared that it was her

intention and desire that this document grant to my said attorney-in-fact full and general power and authority to act on my behalf and I thus direct that the language of this document be liberally construed with respect to the power and authority hereby granted my said attorney-in-fact in order to give effect to such intention and desire. The enumeration of specific items, rights, or acts or powers herein is not intended to, nor does it limit or restrict, the general and full power herein granted to my said attorney-in-fact. It is further my intention and desire that this document qualify as a DURABLE POWER OF ATTORNEY pursuant to KRS 386.093 and that the power and authority hereby granted by this document shall not be affected by any later disability or incapacity of me as principal.

376 S.W.3d at 586–87.

Beverly insisted that the general language in the preamble and the closing language regarding liberal construction and "general full power" meant that Ping was authorized to make any and all decisions on her mother's behalf, not simply the financial affairs and health care decisions specifically provided for in the power of attorney. In rejecting Beverly's argument, we cited section 37 of the *Restatement (Second) of Agency* (1958) which states in relevant part: "Unless otherwise agreed, general expressions used in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates." 376 S.W.3d at 592. The *Ping* power of attorney instrument was very specific, being limited to financial affairs (handling Mrs. Duncan's "monies, goods, chattels, and effects" and "funds" as well

as her "real estate") and making medical care decisions. In this context, we held:

The general expressions upon which Beverly relies did not give Ms. Ping a sort of universal authority beyond those express provisions. On the contrary, even by their terms the general expressions are limited to "every act and thing whatsoever *requisite and necessary* to be done," and again to "every further act and thing whatever kind, nature, or type *required* to be done on my behalf," acts that is, necessary or required to give effect to the financial and health-care authority expressly created. These general expressions thus make explicit the incidental authority noted in section 35 of the *Restatement:* . . . Understood as Beverly contends, as grants of universal authority, the general expressions would tend to render the specific financial and health-care provisions superfluous, contrary to the fundamental rule that a written agreement generally will be construed "as a whole, giving effect to all parts and every word in it if possible." *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (Ky. 1986).

Our careful approach to the authority created by a power of attorney is also consistent with the provision in the *Restatement (Third) of Agency* incorporating the provisions cited above as follows:

(1) An agent has actual authority to take action designated or implied in the principal's manifestations to the agent and acts necessary and incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act.

*Restatement (Third) of Agency* § 2.02 (2006). We are not persuaded either that Ms. Ping did understand, or that she reasonably could have understood

her authority under the power of attorney to apply to all decisions on her mother's behalf whatsoever, as opposed, rather, to decisions reasonably necessary to maintain her mother's property and finances and to decisions reasonably necessary to provide for her mother's medical care.

376 S.W.3d at 592. *Ping* thus applied long established principles of agency law to a power of attorney that this Court read as limited by its terms to healthcare and financial-affairs decisions and also restricted by the limiting terms "requisite" and "necessary." That power, we held, did not authorize the agent to enter an optional arbitration agreement that could not be characterized as incidental to either the principal's health care or her finances, nor as requisite or necessary. Purporting to apply *Ping* to the three very different power of attorney instruments before us in these cases, the majority discounts the differences so as to reach a result at odds with both Kentucky and federal law requiring that arbitration agreements be enforced as rigorously as other contracts. To make clear their differences from the POA in *Ping*, differences that materially distinguish these cases from *Ping*, I turn now to the three power of attorney instruments currently before us.

## I. The *Whisman* Litigation.

The Whisman Power of Attorney instrument expressly grants Whisman the authority to handle in various ways (the verbs include "lease," "purchase," "sell," "encumber" and "retain") the real and personal property of her father including specifically his "money." It then goes beyond those financial decisions or transactions pertaining to his existing or future assets and allows Whisman to "make and sign any and all checks, contracts, notes, mortgages, agreements, or any other document including state and Federal tax re-

turns...." Extendicare maintains that this express language allowing for the making of contracts and agreements, standing alone, is sufficient to imbue Whisman with the authority to execute an arbitration agreement. At least two federal district courts have adopted that position, a position that is persuasive.

In *Oldham v. Extendicare Homes, Inc.*, 2013 WL 1878937, *2 (W.D. Ky. 2013), the power of attorney at issue gave the agent the authority to "draw, make and sign any and all checks, contracts, or agreements." The United States District Court for the Western District of Kentucky held that "a plain reading of the power of attorney" compelled the conclusion that the agent was authorized to enter into an arbitration agreement on behalf of her principal. *Id.* at *3. That court found *Ping* distinguishable for "one obvious and significant reason: the power of attorney in *Ping* did not contain an express provision granting the attorney-in-fact authority to 'draw, make and sign any and all checks, contracts, or agreements.' " *Id.* at *5. *See also Brookdale Senior Living Inc. v. Stacy*, 27 F.Supp.3d 776, 791 (E.D. Ky. 2014) ("This express grant of power [to execute "documents" or "writings"] permitted Kim Stacy to sign the arbitration agreement;" also noting the POA at issue was "much broader" than the POA at issue in *Ping*).

When presented with powers of attorney granting the agent not only the authority to contract, but also the authority to institute and defend suits or claims, other courts have concluded an agent was authorized to enter an arbitration agreement on behalf of his principal, distinguishing *Ping* on the grounds that the power of attorney instrument in that case contained no such authority. *See, e.g., GGNSC Vanceburg, LLC v. Taulbee*, 2013 WL 4041174, *8 (E.D. Ky. 2013) (finding agent had authority to execute arbitration agreement because power of attorney included the authority to "make contracts," "draw, make and sign in my name any and all .... contracts or agreements" and "institute or defend suits concerning my property or rights"); *Kindred Healthcare, Inc. v. Cherolis*, 2013 WL 5583587, *4 (Ky. App. 2013) (holding agent entered enforceable arbitration agreement when power of attorney included specific authorization "to enter into contracts and to institute or defend suits regarding [the principal's] property or rights").

Addressing the same issue in yet another nursing home case in *Sorrell v. Regency Nursing LLC*, 2014 WL 2218175 (W.D. Ky. 2014), the district court elaborated on a power of attorney that included not only the authority to contract but also to institute legal proceedings.

The case at hand is distinguishable from *Ping* in several significant ways. Most obviously, unlike the power of attorney in *Ping*, the POA here grants Bennett authority to act well beyond the categories of health care and financial decisions, including the authority "[t]o make, execute and deliver ... contracts of every nature." Also unlike the power of attorney in *Ping*, the POA here grants Bennett the express authority "[t]o demand, sue for, collect, recover and receive all debts, monies, interest and demands whatsoever now due or that may hereafter be or become due to me (including the right to institute legal proceedings therefore)." Thus, the POA gives Bennett both a broad contract authority as well as the authority to perform acts with significant legal consequences.

* * * * * * *

... Read in light of *Ping*, the powers granted by the POA here are more than adequate to allow Bennett to execute the Arbitration Agreement and bind Sorrell

to its terms. Although the POA does not expressly authorize Bennett to enter into arbitration agreements, the Court can find no reasonable interpretation of the POA that would limit her authority to do so on Sorrell's behalf.

*Id.* at 5–6.

Of course, these courts are correct about the limited nature of the power of attorney in *Ping*; it did not include either the specific authority to contract or the authority to institute and defend suits. Consequently, the focus in that case was on whether the general language in the instrument could be construed to cover executing an arbitration agreement. We noted that under section 2.02 of the *Restatement (Third) of Agency* the agent has the authority "to take action designated or implied in the principal's manifestations" and "acts necessary and incidental to achieving the principal's objectives." We were not persuaded that Ping, as agent, did understand or reasonably could have understood that her authority under the power of attorney covered "all decisions on her mother's behalf whatsoever, as opposed, ... to decisions *reasonably necessary*" to maintain her mother's finances and to provide for her mother's medical care. 376 S.W.3d at 592 (emphasis supplied). Our ensuing discussion of comment h. to section 2.02, entitled "Consequences of act for principal," is probably the genesis of much of the confusion which *Ping*, unfortunately, has caused. This comment, heavily relied upon by both the majority and the Court of Appeals, noted that there are some acts with such consequences for the principal that a reasonable agent would not believe that he or she had been authorized to engage in them. In addition to "crimes and torts" and "acts that create no pros-

pect of economic advantage for the principal," the comment cites as a third example of such acts "otherwise legal [acts which] create legal consequences for a principal that are significant and separate from the transaction specifically directed by the principal." Comment h to section 2.02. The examples given in the comment were granting a security interest in the principal's property or executing an instrument confessing judgment. We then stated:

> We would place in this third category of acts with significant legal consequences a collateral agreement to waive the principal's right to seek redress of grievances in a court of law. Absent authorization in the power of attorney to settle claims and disputes or some such express authorization addressing dispute resolution, authority to make such a waiver is not to be inferred lightly. Here, nothing in Mrs. Duncan's power of attorney suggests her intent that Ms. Ping make such waivers on her behalf.

376 S.W.3d at 593.

However appropriate that observation may have been where a litigant alleged the authority to execute an arbitration agreement can be read into general language ("any, all, and every act and thing whatsoever requisite and necessary to be done") it is certainly capable of being misleading in cases such as these where the alleged authority is premised, not on general "any and all" type language, but on an unequivocal grant of the authority to contract. The grant of an unqualified power to contract is necessarily "express authorization" to agree to dispute resolution through arbitration agreement, just as a "power of attorney to settle claims and disputes," the example noted in *Ping*, would suffice.[20]

---

**20.** "Express *authorization* [to] address[ ] dispute resolution," 376 S.W.3d at 593, is not the equivalent of "express *reference*" to dispute resolution, but that is the construction that has been given to *Ping* by some courts. The adjective "express" was never intended to

Any conclusion to the contrary would run contrary to binding United States Supreme Court precedent prohibiting a state court's discrimination against arbitration in the guise of application of general principles of state law.

Section 2 of the FAA provides, as previously noted, that an arbitration contract covered by the Act "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis supplied). This section ·has been described as "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Accordingly, the United States Supreme Court has routinely and consistently stricken state statutes and judicial holdings which place arbitration agreements in "a class apart" from contracts generally. *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 688, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). In *Doctor's*, the Montana statute at issue provided that an arbitration clause was unenforceable unless notice of the arbitration provision was typed in underlined capital letters on the first page of the contract. Because the first page notice statute did not apply to "any contract," as required by 9 U.S.C. § 2, but specifically and solely to those contracts involving arbitration the *Doctor's* Court held it was preempted by the FAA. Writing for the Court, Justice Ginsburg quoted the following from *Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), a case striking on Supremacy Clause grounds a California statute allowing for judicial resolution of a wage collection dispute irrespective of a binding arbitration agreement:

> In *Perry*, we reiterated: '[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the text of § 2].'

517 U.S. at 685, 116 S.Ct. 1652.

Without exception, the United States Supreme Court has held unenforceable on Supremacy Clause grounds any legislatively-enacted or judicially-created state law which would disfavor arbitration. *See, e.g., AT & T Mobility, LLC v. Concepcion*, 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (California Supreme Court's so-called *Discover Bank* rule regarding unconscionability preempted when applied in a manner that defeats arbitration in violation of FAA); *Marmet Health Care Ctr., Inc. v. Brown*, —— U.S. ——, 132 S.Ct. 1201, 182 L.Ed.2d 42 (2012) (public policy as declared by the West Virginia Supreme Court prohibiting enforcement of predispute arbitration agreements as to claims against nursing homes preempted by § 2); *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984) (California Supreme Court's interpretation of state franchise statute as requiring judicial consideration of all claims brought under the statute preempted due to direct conflict with § 2 and resulting violation of the Supremacy Clause); *Preston v. Ferrer*, 552 U.S. 346, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008) (FAA preempts state law granting

suggest that the power of attorney must specifically mention dispute resolution or arbitration by name but rather that there, must be an express authorization (such as the express authority "to contract") from which it could be reasonably concluded that the agent had ·the power to act on the principal's behalf in agreeing to arbitration.

state commissioner exclusive jurisdiction to decide issue the parties agreed to arbitrate); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (FAA pre-empts state law requiring judicial resolution of claims involving punitive damages).

Significantly, *Marmet Health Care,* —— U.S. ——, 132 S.Ct. 1201, 182 L.Ed.2d 42, addressed the efforts of the West Virginia Supreme Court to invalidate otherwise enforceable arbitration agreements between nursing homes and their residents (or residents' representatives) based on state public policy grounded in the West Virginia Constitution and concerns about nursing home admission practices. In *Brown v. Genesis Healthcare Corporation,* 228 W.Va. 646, 724 S.E.2d 250 (2011), the seventy-page opinion giving rise to *Marmet Health Care,* the West Virginia Supreme Court stated "[t]he admission agreements in this case ... eliminate a fundamental constitutional right: the right of the parties to have a jury trial in the West Virginia circuit court system on the plaintiffs' personal injury claims against the defendant nursing homes." [21] 724 S.E.2d at 270. After an extensive discussion of various access to courts provisions of the West Virginia Constitution, federal law regarding preemption of state laws disfavoring arbitration, nursing home admissions practices, and both procedural and substantive unconscionability, the Court held "as a matter of public policy under West Virginia law, an arbitration clause in a nursing home admission agreement adopted prior to an occurrence of negligence ... shall not be enforced to compel arbitration." *Id.* at 292. The United States Supreme Court's responsive, unanimous and very terse *per curiam* opinion in *Marmet Health Care,* began:

State and federal courts must enforce the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, with respect to all arbitration agreements covered by that statute. Here, the Supreme Court of Appeals of West Virginia, by misreading and disregarding the precedents of this Court interpreting the FAA, did not follow controlling federal law implementing that basic principle. The state court held unenforceable all predispute arbitration agreements that apply to claims alleging personal injury or wrongful death against nursing homes.

The decision of the state court found the FAA's coverage to be more limited than mandated by this Court's previous cases. The decision of the State Supreme Court of Appeals must be vacated. When this Court has fulfilled its duty to interpret federal law, a state court may not contradict or fail to implement the rule so established. See U.S. Const., Art. VI, cl. 2.

132 S.Ct. at 1202. Thus, the state supreme court's announced public policy against such arbitration agreements, a policy premised on state constitutional access to courts provisions, was preempted under the Supremacy Clause of the United States Constitution.

Under this clear precedent, this Court is not at liberty to conclude that in Kentucky a power of attorney that gives the agent express authority to contract does not include the authority to contract for arbitration or, stated differently, the authority to agree to give up the right to a jury trial. Any such holding would fly in the face of federal law and be preempted by the Supremacy Clause because it would clearly

---

**21.** This is precisely the foundation of the argument upon which the majority relies in this case.

not be a state-law principle applicable to "any contract" but rather one that singles out arbitration agreements for disfavored treatment in the same vein as the statutes and judicially-created rules stricken by the United States Supreme Court, particularly the West Virginia Supreme Court decision stricken in *Marmet Health Care.*

In sum, the Whisman Power of Attorney, by including the express authority to contract, necessarily included the authority to contract regarding arbitration.[22] Because Whisman had the requisite authority under the power of attorney instrument, the Extendicare Arbitration Agreement she signed on behalf of her father is enforceable.

## II. The *Clark* and *Wellner* Litigation.

In both the *Clark* and *Wellner* litigation, as noted, before reaching the merits it is necessary to address a procedural issue created by the orders entered by the trial court when it initially referred the matters to arbitration in January 2012. The orders, tendered by Kindred's counsel, concluded with the following language: "IT IS HEREBY ORDERED and ADJUDGED that this action is hereby dismissed and the parties are ordered to resolve this dispute in accordance with the terms of the arbitration agreement executed by and between the parties." After *Ping* was released, counsel for Clark and Wellner moved to vacate the orders, and in November 2012 the trial court ruled that the cases would proceed in court instead of in arbitration proceedings. Although each November order simply stated that the prior order compelling arbitration was vacated, Clark and Wellner have argued, al-

ternatively, that the orders were not final but, if they were, they were properly set aside or vacated pursuant to CR 60.02. Kindred maintains that once the trial court entered an order "dismissing," it lost jurisdiction and was without authority to enter the November 2012 orders. Kindred does not address the propriety of CR 60.02 relief and nor need the Court do so because under Kentucky procedural law the orders compelling arbitration were never final orders.

Kentucky procedural rules apply even where, as here, the Federal Arbitration Act governs the case. In *Atlantic Painting & Contracting Inc. v. Nashville Bridge Co.,* 670 S.W.2d 841, 846 (Ky. 1984), this Court held that a three-month time limitation in the FAA for filing a motion to vacate an arbitration award was not applicable in Kentucky courts because while the FAA preempts state *"substantive* law" it does not preempt state procedural rules, (emphasis in original). As Justice Leibson, writing for the majority, stated: "The [FAA] covers both substantive law *and* a procedure for federal courts to follow where a party to arbitration seeks to enforce or vacate an arbitration award in federal court. The procedural aspects are confined to federal cases." *Id.* (emphasis in original). Citing *Southland Corp. v. Keating,* 465 U.S. at 1, 104 S.Ct. 852, as this Court did in *Atlantic Painting,* as well as later United Supreme Court decisions including *Volt Info. Sciences v. Bd. of Trustees of Leland Stanford, Jr. Univ.,* 489 U.S. 468, 477 n.6, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), state courts have routinely applied their own procedural law in

---

**22.** It bears noting that the Whisman power of attorney included express limitations on the agent entering into certain types of contracts, to wit: "provided, however, that my said attorney is not to bind me as a surety, guarantor or indorser for accommodation, nor to

give away any of my estate whatsoever...." If a principal desired to give an agent the authority to contract but not the authority to agree to arbitration, express language excluding that authority could, and should, be added.

cases where the FAA applies. *See, e.g., Joseph v. Advest,* 906 A.2d 1205 (Pa. Super. Ct. 2006) (collecting cases); *Toler's Cove Homeowners Ass'n v. Trident,* 355 S.C. 605, 586 S.E.2d 581 (2003).

Kentucky, unlike many states, does not address orders granting or denying arbitration in its Civil Rules. However, the Kentucky Arbitration Act provides in KRS 417.060(4) that "[a]ny action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration" is made under the statute. The statute further provides that "the order for arbitration shall include such stay." KRS 417.060(4). This stay of proceedings is essentially the same procedure outlined in 9 U.S.C. § 3:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

So it is clear that under our state procedural law, the proper course for a trial court when entering an order compelling arbitration of the parties' dispute is to stay the court action, not to dismiss it.[23] Thus the trial court erred in "dismissing" these cases, and we are confronted with an obvious issue as to the consequences of that procedural misstep, *i.e.,* whether the orders were nonetheless final and not subject to being set aside unless the stringent standards in CR 60.02 are met. Given the longstanding and frequent reiteration in Kentucky of the rule that orders compelling arbitration are not final (and thus not immediately appealable), I cannot conclude that the trial court's use of the word "dismissing" converted what has always been an interlocutory order in our state courts into a final order.

Pursuant to CR 54.01, "[a] final or appealable judgment is a final order adjudicating all the rights of all the parties in an action or proceeding, or a judgment made final under Rule 54.02." Manifestly, the January 2012 orders under review do not meet these criteria. They do not "adjudicate all the rights of all the parties" and they have no CR 54.02 finality language. Indeed, this Court recently held in *Linden v. Griffin,* 436 S.W.3d 521, 524 (Ky. 2014), that an order compelling arbitration is an interlocutory order and cannot be certified under CR 54.02 given Kentucky law deeming such orders inherently interlocutory. *See also, Commonwealth ex rel. Stumbo v. Philip Morris, USA,* 244 S.W.3d 116, 120 (Ky. App. 2007).

Recently, in *J.P.Morgan Chase Bank, N.A. v. Bluegrass Powerboats,* 424 S.W.3d 902, 907–08 (Ky. 2014), this Court unequiv-

---

**23.** I acknowledge there is a split in the federal circuit courts of appeal and that many of those courts allow their federal district courts to dismiss, rather than stay, the action if the entire dispute is arbitrable. The United States Supreme Court has not addressed whether the district courts must stay, instead of dismissing, such cases. *Green Tree Financial Corp. v. Randolph,* 531 U.S. 79, 87 n.2, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000). It has held that an order dismissing *with prejudice* is final and appealable under § 16(a)(3) of the FAA because the statutory federal appeal right applies to any "final decision with respect to an arbitration." 531 U.S. at 89, 121 S.Ct. 513. Here, there is no order dismissing with prejudice but, in any event, under Kentucky procedural law an order compelling arbitration is not a final and appealable order.

ocally recognized the interlocutory nature of an order compelling arbitration, with appellate review of the trial court's order delayed until an appeal of the entire case:

> Procedurally, under state law regarding arbitration, if a court finds that as a matter of state contract law there is no arbitration agreement and denies the application to compel arbitration, the moving party may file an immediate appeal under KRS 417.220(1)(a), if the agreement is subject to the Kentucky Uniform Arbitration Act, or under Civil Rule 65.09, if the agreement is subject to the Federal Arbitration Act, *see North Fork Collieries, LLC v. Hall,* 322 S.W.3d 98, 102 (Ky. 2010). There is no like provision in the statutes to allow a party against whom arbitration is wrongfully ordered to take an immediate appeal, nor have we read the Civil Rules to allow one. Instead, any appeal of the trial court's contract decision must come in a direct appeal of the ruling after the case is final.

In *Bluegrass Powerboats,* this Court held the interlocutory nature of the order sending the case to arbitration left the trial court with discretion to revisit that order as it could any interlocutory order, even after the arbitrator had dismissed the case for an unstated reason.

The interlocutory nature of an order compelling arbitration thus has been unquestioned, with Kentucky courts frequently observing that such orders are not appealable. *See, e.g., American General Home Equity, Inc. v. Kestel,* 253 S.W.3d 543, 547 (Ky. 2008) (*citing Fayette Co. Farm Bureau Federation v. Martin,* 758 S.W.2d 713, 714 (Ky. App. 1988)). Given the longstanding and uniform procedural treatment of such orders, it is clear that regardless of the terminology in an order compelling arbitration the order is by its very nature an interlocutory order that is not final and appealable under Kentucky law. Just as in *Bluegrass Powerboats,* when the trial court is presented with grounds for reconsidering the order, specifically grounds that suggest there is *no* valid agreement to arbitrate, the trial court may revisit it. Consequently, the trial court, in both the *Clark* and *Wellner* cases had jurisdiction to set aside its prior order compelling arbitration without resort to CR 60.02 because the first order was never final. Turning to the merits issue of whether there was an enforceable arbitration agreement in these cases, however, and upon examination of the specific power of attorney instruments, I ultimately conclude that the original January 2012 orders compelling arbitration were correct.

The Clark Power of Attorney included the authority "to draw, make, and sign in [Olive Clark's] name any and all checks, promissory notes, contracts, deeds or agreements." Under the principles regarding an agent's express authority to contract discussed above in the context of the *Whisman* litigation, Janis Clark clearly was authorized by her mother to enter into the Kindred Arbitration Agreement. The trial court's original order compelling arbitration was correct.

The Wellner Power of Attorney also contains authority to contract but the phraseology is somewhat different: "To make, execute and deliver deeds, releases, conveyances and contracts of every nature in relation to both real and personal property, including stocks, bonds, and insurance." Whereas the Clark and Whisman Power of Attorney instruments had general authority "to contract" language that made no reference to "property," this POA instrument contemplates making "contracts of every nature in relation to both real and personal property." Given that the eventual negligence and statutory claims against Kindred constitute a chose

in action, a form of personal property, this additional "property" language does not change the nature of the agent's authority in these circumstances, *i.e.*, Mrs. Wellner was fully authorized to sign the Kindred Arbitration Agreement on behalf of her husband.

A "chose in action" is defined generally as "[a] proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort" and also as "the right to bring an action to recover a debt, money or thing." BLACK'S LAW DICTIONARY, 275 (9th ed. 2009). In *Weakley v. Weakley*, 731 S.W.2d 243, 246 (Ky. 1987), Justice Leibson, writing in dissent, observed that a "cause of action for damages for personal injury is . . . a chose in action. . . . It is a valuable right which may be reduced to money damages, and as such it is a form of property acquired as of the date of the injury." Kentucky has long acknowledged that "choses in action are personal property." *Button v. Drake*, 302 Ky. 517, 195 S.W.2d 66, 69 (1946). *See also, Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313–14, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (recognizing that a cause of action is a form of personal property protected by the Due Process Clause); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (recognizing that a statutory claim under state's Fair Employment Practices Act is a species of personal property protected by the Due Process Clause).

Applying these principles, it is first obvious that the legal claims which Mr. Wellner, and ultimately his estate, had against Kindred had not accrued as of the date Mrs. Wellner signed the Kindred Arbitration Agreement. However the future nature of this form of personal property does nothing to undermine the conclusion that the Wellner POA encompassed the authority to deal with it. Powers of attorney, by their very nature, operate in the future. Time marches on and the agent is given authority to deal with specific matters, both expected and unexpected, which the principal is not able or willing to handle. *Restatement (Third) of Agency* § 2.02 (Scope of Actual Authority) comment c. (2012) (noting that questions of interpretation as to whether an agent acted with actual authority "have a temporal focus that moves through time as the agent decides how to act"). The return on a particular investment held by the principal may diminish and require a reallocation of investments; the principal may receive an inheritance of real and personal property that must be managed; the principal's own property may be lost or damaged due to fire or a destructive storm, necessitating an insurance claim; a closely-held business in which the principal owns stock may be faced with a buy-sell situation when one owner desires to leave; a tenant in property owned by the principal may cease paying rent but refuse to vacate, necessitating an eviction action and claim to recover past rent. Just as the appropriate language in a power of attorney instrument would (and should) authorize an agent to deal with these future occurrences, a POA that allows for the authority to contract regarding "personal property" encompasses the power to contract regarding future property of the principal such as a not-yet-accrued injury claim, a future "chose in action." Thus, I would find no restriction in the Wellner Power of Attorney instrument's language that would preclude the same result reached in the other two cases; the power to "make" a contract concerning Mr. Wellner's personal property (which includes choses in action) authorized his agent to enter into the Kindred Arbitration Agreement. In sum, the trial court's original order compelling arbitration was correct.

Finally, it is necessary to address at some length the majority's contention that "a ground existing at state law" imposes restrictions on agent-entered arbitration agreements, restrictions that preclude enforcement of the arbitration agreements in these cases and would do so in many other cases as well. Section 2 of the FAA, as noted above, provides that an arbitration contract covered by the Act "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The United States Supreme Court has repeatedly described the Act as " 'embod[ying] [a] national policy favoring arbitration.' " *AT & T Mobility, LLC v. Concepcion,* 131 S.Ct. at 1749 (quoting *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)). In *Concepcion* the Court explained that while "§ 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." 131 S.Ct. at 1748. The FAA, in other words, cannot, through § 2's saving clause, "be held to destroy itself." *Id.*

Engaging in just such an exercise of statutory deconstruction, the majority contends that its patently anti-arbitration rul-

ing[24] does not run afoul of this well-established federal law because "our holding does not prohibit arbitration of 'any particular type of claim.' " The problem with this rationale, apparently derived from a misreading of *Concepcion,*[25] is that prohibiting arbitration of a particular type of claim is not the only way a state law or state court holding can violate the FAA.

In *Concepcion,* for example, the state rule at issue—California's so called *Discover Bank [v. Superior Court,* 36 Cal.4th 148, 30 Cal.Rptr.3d 76, 113 P.3d 1100 (2005) ] rule—did not *prohibit* the arbitration of any claim whatsoever. Instead, by deeming collective-arbitration waivers "unconscionable," the rule merely conditioned the enforcement of arbitration provisions in consumer contracts on the availability of collective arbitration. The Court held that this application of state unconscionability law violated the FAA, not because it prohibited arbitration, but because it imposed an undue burden on the enforcement of arbitration agreements, a burden that frustrated the FAA's basic purpose of ensuring parties the ability to choose arbitration in a relatively expeditious, informal, and inexpensive form.

Interestingly for the purposes of this case, in the course of its discussion the

---

**24.** The majority protests several times that arbitration is protected under Kentucky law and that its ruling does not spring from hostility toward that form of dispute resolution. These protests ring hollow, however, since every time the majority proclaims arbitration "good," it with the same breath proclaims a jury trial "better," nay sacrosanct and "God-given." Curiously, discussion of this "God-given" right includes no reference to any religious text. Plainly, the right to a jury trial is a human creation.

**25.** The majority relies on the following passage from *Concepcion:* "When state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward:

The conflicting rule is displaced by the FAA." 131 S.Ct. at 1747. *Concepcion,* however, was not one of the "straightforward" cases. The Supreme Court went on to explain that outright prohibitions are not the only state rules at odds with the FAA. Rather, even "a doctrine normally thought to be generally applicable, such as duress or, as relevant here, unconscionability," can violate the FAA if "applied in a fashion that disfavors arbitration." *Id.* Here, the majority has applied the venerable agency-law rule limiting an agent's actual authority to that granted by the principal "in a fashion that disfavors arbitration," and thus has violated federal law.

U.S. Supreme Court explained that "a [state] court may not 'rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what ... the state legislature cannot.'" *Concepcion*, 131 S.Ct. at 1747 (quoting *Perry v. Thomas*, 482 U.S. at 493 n.9, 107 S.Ct. 2520). As contracts, of course, arbitration agreements are distinguished by their effect on the parties' trial rights, so, as an example of an invalid unconscionability holding based on the "uniqueness of an agreement to arbitrate," the Court cited "a rule classifying as unconscionable arbitration agreements ... that disallow an ultimate disposition by a jury (perhaps termed 'a panel of twelve lay arbitrators' to help avoid preemption)." The point was the same one the Court reiterated in *Marmet Health Care, i.e.*, that public policy either disfavoring arbitration directly under state law, or disfavoring it indirectly by favoring its correlative opposite—a judicial trial—whether that policy be handed down from on high or devised by judges,[26] far from exempting the state from the

26. The majority makes much of the fact that the right to a jury trial guaranteed under Section 7 of the Kentucky Constitution is characterized in that document as "inviolate," a right to be "held sacred," the only right, the majority maintains, expressly recognized as "a divine God-given" one. The majority's invocation of a uniquely "sacred" right to a jury trial is not well-founded, as is evident if one consults the Debates of the Kentucky Constitutional Convention of 1890, where the drafters concerns were almost exclusively about whether criminal trials should require a twelve-person jury and a unanimous verdict.

As Section 248 of our Constitution makes clear (that Section allows for the departure from the sacred, ancient mode of trial by jury in "all trials of civil actions in the Circuit Courts, [where] three-fourths or more of the jurors concurring may return a verdict"), the "sacredness" of the jury-trial guarantee had much more to do with the protection it afforded criminal defendants against oppression by judges and the State than it did judicial protection of civil case plaintiffs against oppression by arbitrators.

Arguing during the 1890 constitutional debates for a relaxation in civil cases of the unanimous verdict requirement, Representative E.J. McDermott of Louisville observed that

So long as most trials were a contest between the King and the subject, the jury was indispensable, and so long as the contest here is between the State or People and the criminal, it may be necessary to have a jury, and it may not be very wrong to require unanimity; but in a contest between Jones and Smith, why should you require a unanimous verdict of twelve men? ... By requiring unanimity injuries you either compel men to violate their oaths for the sake of agreeing with others, or you cause [through hung juries] ruinous delay and expense to litigants. Litigation is now so expensive and slow that it is steadily decreasing, ... We must do something to make justice cheap and sure. That, after purity of elections, is the great reform of the day. This whole matter should be left to the Legislature for experiment and improvement. There may be some reason why the Bill of Rights should secure to every criminal the right of trial by jury, but there is no reason at all for saying that, in suits between private individuals, the Legislature shall not have complete power to regulate procedure.

*Official Reports of the 1890 Convention*, Vol. 1 at 671–72 (Mr. McDermott). Section 248, of course, does not go so far as to give the General Assembly complete power to regulate civil procedure, but it goes far enough to show that the 1890 Convention regarded civil juries as a good deal less "sacred" than the juries in felony criminal cases.

As noted above, Section 250 of our state Constitution goes even further and requires the General Assembly to provide for arbitration, so that private litigants "may choose that summary mode of adjustment." The convention's adoption of that Section is telling in its succinctness:

The Clerk: The next amendment is that offered by the Delegate from Boyle, by way of an additional section.

The additional section was read, and is as follows:

FAA, was the very reason the FAA was enacted.

As noted above, another case that did not involve a State's attempt to prohibit arbitration of a particular type of claim was *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. at 681, 116 S.Ct. 1652. In that case, the Court addressed a Montana statute that conditioned enforcement of arbitration clauses on the appearance, on the first page of the contract, of an underlined and capitalized notice that the "contract is subject to arbitration." Striking down the statute as violative of the FAA, the Court explained that while state courts are free under the Act to invalidate an arbitration clause "upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, "[c]ourts may not ... invalidate arbitration agreements under state laws applicable *only* to arbitration provisions.... By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.'" 517 U.S. at 687, 116 S.Ct. 1652 (quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 511, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); other citation omitted). The point again is that State courts may not "'rely on the uniqueness of an agreement to arbitrate as a basis for'" denying enforcement. 517 U.S. at 687 n.3, 116 S.Ct. 1652 (quoting *Perry v.*

*Thomas,* 482 U.S. 483, 492, n.9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)).

Thus, although it is true, as the majority asserts, that it has not undertaken to prohibit outright the enforcement of arbitration clauses in a particular type of claim, as the Supreme Court of West Virginia attempted to do in *Marmet Health Care,* the majority has nevertheless violated the FAA, as explained in *Concepcion* and *Doctor's Associates,* by conditioning the enforcement of agent-entered arbitration agreements on the agent's having been "expressly" and "specifically" authorized to enter such an agreement, even where the principal has authorized that agent to make contracts generally and/or to bring and settle suits on the principal's behalf. In contravention of the FAA and controlling U.S. Supreme Court precedent, the majority's specific-authorization requirement burdens agent-entered arbitration agreements more heavily than either agent-entered contracts generally, or judicial forms of agent-initiated dispute resolution.

The majority disavows, of course, any intent to single out arbitration agreements and claims merely to be creating a general rule to the effect that an agent cannot waive the principal's constitutional rights without "express" and "specific" authority to do so. Agents, however, routinely exercise, compromise, and waive fundamental constitutional rights on behalf of their principals. *Section 1* of the Kentucky

It shall be the duty of the General Assembly to pass such laws as shall be necessary and proper to decide differences by arbitrators, to be appointed by the parties who may choose that summary mode [for] adjustment.

Mr. [R.P.] Jacobs [the Delegate from Boyle]: That is section ten of the present Constitution. We have no provision, so far, covering that point, and [such a provision is needed] to avoid the interpretation placed on the present Constitution by some mem-

bers that we can only litigate matters by the present mode.

A vote being taken, the additional section offered by the Delegate from Boyle was adopted.

*Official Reports of the 1890 Convention,* Vol. 4 at 4935 (Mr. Jacobs). Not only, then, does the majority's "sacred" right to a civil jury trial fail to justify the sidestepping of federal law, but it likewise fails to justify the majority's elevation of one state constitutional right above another.

Constitution, for example, includes among each person's "inherent and inalienable rights," "[t]he right of acquiring and protecting property." And Section 19 guarantees that no law shall be enacted "impairing the obligation of contracts." Agents, of course, make innumerable decisions implicating and compromising the principal's fundamental rights to enter particular contracts and to acquire and protect particular forms or items of property, and they do so on the basis of general grants of authority to contract and to handle property.[27] Remembering that corporations necessari-

**27.** The majority rejects the nursing homes' contentions in these cases that the agents had authority to enter the arbitration agreements under power-of-attorney provisions providing that the agent could contract on behalf of the principal, could bring suit for the principal or settle the principal's disputes, or could "do anything" the principal could do. I tend to agree with the majority that the "do anything" POA provisions are the least helpful since they obviously do not mean what they purport to say. Clearly there are things the principal could do that are beyond any reasonable understanding of the agent's authority. What such a provision actually means, then, becomes a difficult question for agents and courts alike. I need not address the "do anything" provisions in these cases, however, because the POAs in dispute include the specific provisions allowing the agent to contract and to bring suit, provisions which in my view authorize the arbitration agreements at issue.

Although it is obliged to engage in a good deal of hair-splitting to get there, the majority concludes that the "contract" and "suit" provisions, like the "do anything" provisions, do not "specifically" and "expressly" authorize pre-dispute agreements to arbitrate, *i.e.*, to waive a jury trial, and thus did not authorize the arbitration agreements before us. This is at odds with Section 33 of the *Restatement (Second) of the Law of Agency*, p. 115 (1958) which provides that

An agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts.

Certainly there could be facts counseling otherwise, but in general, it seems to me (even aside from the FAA), an agent is not unreasonable if he understands his or her general authority to contract to include the authority to make arbitration contracts. Similarly, an agent with written authority to sue and to settle disputes is not unreasonable if he believes that authority encompasses such alternatives as predispute arbitration agreements.

The majority's new rule is also inconsistent with Section 2.02 (Scope of Actual Authority) of the *Restatement (Third) of Agency*. In pertinent part, that Section provides that

(1) An agent has actual authority to take action designated or implied in the principal's manifestations to the agent and acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act.

As the commentary to this Section points out, the interpretation of an agent's actual authority, even if manifested in a written document such as the POAs before us, is not the same thing, and should not be approached in the same manner as the interpretation of a contract: questions about an agent's actual authority "focus[ ] on the reasonableness of one party's [the agent's] belief" at "the time the agent decides what action to take," "questions of contractual interpretation," on the other hand, "focus on the parties' shared meaning as of the time of a promise or agreement." Section 2.02 comment c. Thus, even if the majority's highly technical parsing of the POAs before us could be deemed appropriate in a contractual context, it is not appropriate here. To reiterate, focusing, as we should, on what the POAs would communicate to an ordinarily reasonable agent, the general grants of authority to contract and to "bring suit" authorize the disputed arbitration agreements.

Hair splitting aside, my focus is not the majority's narrow reading of these particular POAs, but rather the majority's new rule (a rule that largely renders irrelevant the rest of its analysis) that an agent's authority to enter an arbitration agreement on behalf of the principal requires some special, "express" and "specific" manifestation of the principal's consent. By singling out and imposing extra burdens on agreements to arbitrate, the majority's new rule violates the FAA.

ly act exclusively through agents and that corporations have pertinent constitutional rights (*e.g.,* acquiring and disposing of property), if the majority's new rule requiring "express" and "specific" authority for an agent to compromise the principal's constitutional rights were truly meant to apply generally, then to say that the majority has revolutionized our agency law would be a gross understatement.

If, as is more likely, the majority's new rule is not really meant to apply to state constitutional rights generally, then to which constitutional rights does it apply? As noted above, the majority seems at some points in its discussion to suggest that its new "express"-and-"specific"-authority rule applies only to "sacred" constitutional rights, of which, according to the majority, Kentucky has but one—the right to a jury trial. Thus understood, the new rule's disruption of our agency law would be minimized, but if the new rule applied only to that one right, *the one right that just happens to be correlative to the right to arbitrate,* then the rule would clearly run afoul of the FAA, because it would operate disproportionately, if not exclusively, to prevent the enforcement of arbitration agreements. It would, in disregard of controlling Supreme Court precedent, "rely on the uniqueness of an agreement to arbitrate as a basis for denying enforcement." *Concepcion, supra; Doctor's Associates, supra* (citation and internal quotation marks omitted).

Hoping to avoid that outcome, the majority also says that its new "express"-and-"specific"-authority rule applies "generally" to "fundamental constitutional rights." It does not attempt to define that term (so again we confront at least a potential upheaval in our agency law); but it presumes,

by way of illustration, that POAs such as those involved in these cases could not be construed to authorize the agent to "enter into an agreement to waive the principal's civil rights; or the principal's right to worship freely; or enter into an agreement to terminate the principal's parental rights; put her child up for adoption; consent to abort a pregnancy; consent to an arranged marriage; or bind the principal to personal servitude." Nor, the majority asserts, would these POAs authorize the agent "to enter a plea agreement pleading his principal guilty to a criminal offense," or waive the principal's rights "to remain silent in the face of police questioning; to have the assistance of counsel during a trial; to plead guilty to a crime and thereby waive his right to a trial."

The majority makes these assertions without citing any authority,[28] but accepting these assertions as correct—that a garden variety POA such as those at issue here would not authorize the agent to commit the principal to an arranged marriage, to personal servitude, or to a criminal conviction—that fact does not lead to the conclusion the majority wants to draw: that an agent's committing a principal to arbitration is just as outrageous and as worthy of judicial skepticism and intervention as an agent's committing a principal to an arranged marriage, personal servitude or a criminal conviction. To state the comparison as the majority does is to make plain the hostility to arbitration that gives rise to it.

The difference between arbitration and the majority's parade of horribles is obvious. Unlike the majority's examples, all of which suppose the waiver or compromise of a basic, personal substantive right

---

**28.** Clearly many of the actions referred to by the majority are precluded by controlling substantive law, *e.g.* the vast body of federal and state law regarding a knowing and voluntary guilty plea.

(rights that an ordinary attorney-in-fact is rarely, if ever, asked to address on the principal's behalf), arbitration agreements, which are commonplace these days, involve no substantive waiver. The principal's substantive rights remain intact, only the forum for addressing those rights is affected. The majority's apparent presumption that the arbitration agreement has substantive implications adverse to the principal (and thus belongs on the list of hard-to-waive substantive rights) is the very presumption Congress sought to counteract with the FAA. *Southland Corp. v. Keating,* 465 U.S. at 14, 104 S.Ct. 852 (discussing Congress's intent to counteract "common law hostility toward arbitration").

Thus, while it may well be possible to frame a rule under state law to the effect that a presumption exists against an agent's authority to waive certain substantive rights of the principal, it does not follow that state law would include the right to civil trial among those presumptively non-waivable rights; and even if, as the majority would have it, the state rule did purport to hold sacrosanct the principal's right to trial in civil cases, under *Concepcion* and the FAA, the saving clause of which is not to be construed as a self-destruct mechanism, that aspect of the state rule would be preempted by federal law. As noted already several times, and as the United States Supreme Court has made absolutely clear, what state law cannot do directly—disfavor arbitration—it also cannot do indirectly by favoring arbitration's correlative opposite, a judicial trial. Since that is the express purpose of the rule the majority pronounces and since the application of that rule will clearly have a disproportionate effect on the ability of agents to enter arbitration agreements (as opposed to other contracts), the majority's new rule is plainly invalid.

In addition to the disregard of the Supremacy Clause and controlling precedent from the U.S. Supreme Court, the majority's new rule disregards our own Kentucky practice governing jury trials. Pursuant to CR 38.02, a litigant must "demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefore in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue." More notably, CR 38.04 provides that "[t]he failure of a party to serve a demand as required by this rule and to file it as required by Rule 5.05 constitutes a waiver by him of trial by jury." This rule has governed practice in Kentucky courts since its adoption in 1953. *See, e.g. Log v. Whitney,* 339 S.W.2d 164 (Ky. 1960) (right to jury trial waived unless timely written demand filed and served in accordance with rule); *Empire Metal Corp. v. Wohlwender,* 445 S.W.2d 685 (Ky. 1969) (same); *Louisville & Jefferson Co. Metropolitan Sewer Dist. v. Bischoff,* 248 S.W.3d 533 (Ky. 2007) (explaining that CR 38's waiver provision does not conflict with Section 7 of the Kentucky Constitution). Just how "sacred" can the civil jury trial right be when our own court rules deem it waived unless a party promptly demands it in writing? Without question the right to a jury trial in a civil case is an important one, but the majority's new rule requiring an "express"—and—"specific" waiver of that right before an agent acting pursuant to a broad power of attorney can enter into a valid arbitration agreement elevates the civil jury right to a heretofore unrecognized status.

State courts, the U.S. Supreme Court recently observed, are called upon more frequently than federal courts to apply the FAA. "It is a matter of great importance, therefore," the Supreme Court continued, "that state supreme courts adhere to a

correct interpretation of the [FAA] legislation." *Nitro–Lift Technologies, L.L.C. v. Howard,* —— U.S. ——, 133 S.Ct. 500, 501, 184 L.Ed.2d 328 (2012). The Supreme Courts in California (*Concepcion*), West Virginia (*Marmet Health Care*), and Oklahoma (*Nitro–Lift*) have recently disregarded that responsibility and attempted, with predictable results, to "rule around" the FAA. Credit the majority with a clever contribution to this new genre. Whether one sympathizes with the majority's dislike of federally imposed arbitration or not, the inescapable fact remains that the majority has disregarded controlling law.

In sum, a power of attorney instrument that gives the agent authority to make contracts generally on behalf of his or her principal, and even one that allows the agent to execute contracts regarding the principal's personal property, necessarily includes the power to enter into an arbitration agreement. Accordingly, this Court should grant the motions of Movants Extendicare and Kindred for interlocutory relief pursuant to CR 65.09 and remand these cases to their respective courts with instructions to enter an order compelling arbitration in each case.

Minton, C.J.; and Noble, J., join.

NOBLE, J., DISSENTING:

Although I agree with some points made by the majority, which are actually not at issue in these cases, I concur with Justice Abramson's dissent. I dissent from the majority's holding that crafts a rule requiring special treatment of the right to a jury trial that conversely treats the right to arbitrate as a lesser process when the United States Supreme Court has held that it is at least an equal process of dispute resolution, if not a preferred one, under the Federal Arbitration Act (FAA). Justice Abramson has pointed this out at some length and I will not repeat her

analysis here. I also cannot see that this elevation of the right to trial by jury actually affects the *formation* of a contract to arbitrate, which is essentially the only question left to state law after *AT & T Mobility, LLC v. Concepcion,* 563 U.S. 333, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011). At least, if it does, it does so by fiat.

And, I take issue with the majority's listing of other possible acts, such as binding a principal to personal servitude, to demonstrate the grave harm that comes from allowing an agent to make important decisions on behalf of a principal, as nothing more than a non sequitur, or irrelevant speculation, because none of the events suggested in any way compares with making a logical and legal decision to allow for the arbitration of disputes. Of course an agent may not do that which is illegal, nor under his fiduciary obligations can he act against his principal's best interest, which all the examples listed would certainly be. Our law already allows for a remedy if an agent so forgot him or herself, including criminal prosecutions and civil damage awards. I cannot see entering into an arbitration agreement rather than choosing a trial by jury as in any way comparable. There is simply no "horse" to be let out of the "barn" here.

I write separately, however, to state my view on agency law as applied in these important cases, which has become needlessly confused since this Court's decision in *Ping v. Beverly Enterprises, Inc.,* 376 S.W.3d 581 (Ky. 2012).

First, I acknowledge that there are thorny state-law questions regarding the formation of a binding arbitration agreement after the U.S. Supreme Court's decision in *Concepcion.* But what that case makes clear is that a state may not make statutory or case law determinations that serve to limit the use of arbitration agreements

under the FAA. As a federal statute, that Act obviously enjoys the protection of the Supremacy Clause of the United States Constitution. Any state statute or case holding that is contrary to the application of the FAA cannot stand.

But even in *Concepcion*, the Supreme Court recognized, as Justice Abramson points out, that *whether* an arbitration agreement has been created is a state-law contract-formation question. This Court has addressed this question in several cases, but most distinctly in *J.P.Morgan Chase Bank, N.A. v. Bluegrass Powerboats*, 424 S.W.3d 902 (Ky. 2014). In that case, the trial court had to determine if the parties had entered into an arbitration agreement to resolve bank-account disputes through arbitration rather than access to court. The trial court first held that there was such an agreement, but later revisited that decision and concluded that there was not. This Court upheld that conclusion, finding that not only did a trial court have the legal authority to revisit any interim order, but that it also had the authority to say whether an arbitration agreement had been formed in the first instance. This conclusion cemented the rule in Kentucky, as recognized by the U.S. Supreme Court, that the formation of an arbitration agreement is a matter of state contract law.

It is significant that arbitration agreements at heart are nothing more than that: agreements. The theory behind promoting arbitration is that it is viewed as a faster, less complicated proceeding than going through the full panoply of rights and procedures attendant to a trial either to the court or to a jury. This may or may not be true, but the decision to avoid court by entering into an arbitration agreement is wholly a matter of personal contract between two persons or entities. It is simply an agreed-upon *choice* as to how a dispute is to be decided. It is not compelled, any more than a citizen is compelled to seek redress in court. This freedom to choose is the essence of contract.

And, giving due deference to the Supremacy Clause and the FAA, if a person has properly entered into an arbitration agreement, then it is enforceable, as any other contract would be.

There can be no dispute that if any of the principals in these three cases had competently entered into an arbitration agreement, he or she would be bound. These cases are complicated by the fact that the agreements in question were not first-party agreements, but instead were made by persons acting under powers of attorney for their principals. So this Court is confronted not with one legal question, but two. First, is the agent empowered to make such an agreement for the principal in these cases? Second, having entered into the agreements, are they binding on the principle and the attorney in fact (or agent)? The two questions are intertwined, but both inquiries must be answered.

All three powers of attorney at issue in these cases purport to be general, durable powers of attorney. It has long been the agency law in Kentucky and elsewhere that the language in the power of attorney expresses the intent of the principal in regard to what authority the agent has. A *general* power of attorney is designed to allow the agent to take care of the principal's affairs while the principal is absent or unable to act, and is viewed as giving the agent the power to do anything that the principal could do if he were acting instead. At times, a general power of attorney will use broad language granting authority to the agent, but then specifically state (and often say "but not limited to") some specific powers that are included under that grant. General powers of attor-

ney may also contain specific limitations on otherwise broad authority, such as a specific statement saying that the general power does not include a specified action. Other powers of attorney may be *specific* powers of attorney, such as a power to buy cotton, even though the agent may be given unfettered authority to act in regard to buying cotton. These grants of authority to an agent have long been in use. *Durable* powers of attorney were created by statute to survive the incapacity of the principal, and enable the principal's wishes to be carried out even if he or she is unable to act themselves; they are often combined with general powers of attorney.

All three powers of attorney in these cases grant very broad authority followed by specific statements about that authority. The Whisman power gives his agent "full power for me and in my name and stead, to *make contracts,* ... [and] to institute or defend suits concerning my property or rights," (emphasis added), among other grants. The Clark power grants her agent "full power for me and in my name, place and stead, in her sole discretion, to transact, handle, and dispose of all matters affecting me and/or my estate *in any possible way.*" (Emphasis added.) It also specifically grants the agent the power to *make contracts,* and "[g]enerally to do and perform for me and in my name all that I *might do* if present." The Wellner power gives the agent the power to act "as my true and lawful Attorney–in–Fact for me and in my name, place and stead" and then specifically provides that his agent may "demand, sue for, collect, recover and receive all debts, monies, interest, and *demands whatsoever* now due or that may hereafter be or become due to me including the right to institute *legal proceedings* therefor," (emphasis added), among other things. It is difficult to conceive that these powers of attorney, broad as they are even in the specified state-

ments, do not include the authority to decide on an alternative way to resolve a dispute and to enter into an agreement to do so in the best interest of the principal.

And this is true, even in the face of longstanding Kentucky law that powers of attorney must be strictly construed, and that a power of attorney delegating authority to perform specific acts is limited to the specific *purpose* authorized. The *actual language* of these powers can only be read to allow such a choice unless a court does as the majority has done by excepting out the state right to a jury trial. Clearly, the United States Supreme Court has seen no conflict between the FAA and the Seventh Amendment right to a trial by jury.

But this does not mean that if a power of attorney specifically lists actions that are *included* in a general power, or limits the full general exercise of power by a specifically stated limitation, that this transforms the general power of attorney into a specific power of attorney, which has become the unfortunate reading of our holding in *Ping.*

In retrospect, it has become clear to me that while this Court reached the right result in *Ping,* at least half of the reason we gave for reaching that result was not actually correct. We relied on a line of cases applying the rule of strict construction of powers of attorney to read a limit into general powers of attorney that list specific powers, even though specific powers were illustrative. The problem is that the strict-construction rule originated in cases that addressed *specific* powers of attorney, and held that general language accompanying what was otherwise a specific grant of power should be read strictly so as not to expand the agent's authority beyond that intended by the principal.

Among the earliest cases to lay out this rule of strict construction (both of which are cited by the majority) are *Harding v. Kentucky River Hardwood Co.*, 205 Ky. 1, 265 S.W. 429, 431 (1924), and *U.S. Fidelity Co. v. McGinnis,* 147 Ky. 781, 145 S.W. 1112 (1912). Unlike in the cases now before this Court, those cases involved *specific* powers of attorney granting limited powers. In *Harding,* for example, the agent was appointed "to act for it [the bank] in all respects in its behalf in a suit against the Kentucky River Hardwood Company and other, with full power to sign in its name a bond for costs and do other acts necessary." 265 S.W. at 431. The Court applied the strict-construction rule to mean that the agent could not settle or discount the claim and was limited only to signing the bond. In *McGinnis,* the agents in question had a power of attorney giving them authority to execute bonds in judicial proceedings (the principal, United States Fidelity & Guaranty Company, was in the surety business). 145 S.W. at 1113. The Court applied the strict-construction rule to this power of attorney to mean that the agents could not enter into other types of agreements, such as an agreement that another surety would be on a bond temporarily and would be released upon the execution of a bond by the principal surety company.

In these cases, the attorneys in fact, the agents, were given authority to engage in certain types of transactions. This is common in the business world. Most people encounter this type of relationship when buying insurance from an agent of an insurance company. That agent no doubt has a limited authority to engage in certain types of transactions, usually the selling of insurance products. It makes sense to apply a rule of strict construction to whatever power of attorney controls the relationship between that agent and the principal insurance company. Otherwise,

fleeting general language, added only to clarify that the agent may do what is necessary to carry out the specifically directed or authorized task, could swallow the entire principal-agent relationship.

But in these cases, unlike some we have recently decided, such as *Ping,* we have been dealing with general powers of attorney, usually executed by a person concerned about becoming incapacitated, delegating to the agent the power to manage the person's affairs as a whole. Using the cases laying out the strict-construction rule to support our conclusion in *Ping* has caused confusion with respect to powers of attorney. In *Ping* we concluded that the enumeration of specific categories of decisions—financial and healthcare—along with language giving the agent the power to do acts that were "requisite and necessary to be done" and "required to be done" limited the scope of the authority that was granted. *Id.* at 591–94. That language is being read by lawyers and several courts to say that if specific powers are enumerated in a power of attorney, the scope of the power is limited to those enumerated acts, as a broad principle of agency law, regardless of whether the power of attorney was intended to be a general one aimed at giving the agent full authority to conduct the principal's affairs.

What the Court should have placed more emphasis on in *Ping* is the "requisite and necessary to be done" and "required to be done" language that qualified the otherwise general grant of "full and complete power and authority to do and perform any, all, and every act and thing whatsoever." *Id.* at 590–91. Because it was not requisite or necessary for the agent to enter into the arbitration agreement—the nursing home said so in its documents—we found that the agent exceeded the reasonable interpretation of the power by so doing; but also held that this

interpretation of the scope of the power was colored by the specific grants of power enumerated in the instrument.

The principal in *Ping* was 79–year–old Alma Duncan, who was eventually incapacitated by a stroke. Before her incapacity, she executed a general, durable power of attorney naming her daughter, Donna Ping, as her agent (or attorney in fact). The daughter, in the course of admitting her mother to a nursing home after the stroke, signed an optional arbitration agreement as part of the admissions paperwork.

Although the power of attorney under which she acted described itself as a general one, it contained both general and specific elements, which gave rise to the dispute. As noted above, the document began by stating that the daughter had authority "to do and perform any, all, and every act and thing whatsoever requisite and necessary to be done, to and for all intents and purposes, as [the principal] might or could do if personally present." *Id.* at 586. Boiled down, this seemingly broad grant (any, all, and every act) was to do all things "requisite and necessary."

But the document then stated that the acts and things the daughter could do "includ[ed] but [were] not limited to" certain kinds of financial decisions (some broadly worded) and healthcare decisions.[29] This Court read these specific included grants as limiting the overall scope of the daughter's authority, relying on law stating that "general expressions used in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates," and that "[t]he specific authorization of particular acts tends to show that a more general authority is not intended." *Id.* at 592 (quoting Restatement (Second) of Agency § 37 (1958)).

However, reading those specific grants as *limits* on the agent's authority, standing alone, does not comport with the express language of the power of attorney, which stated that its broader grant included *but was not limited* to the specific actions listed. And later, the power of attorney again expressed the principal's "intention and desire that this document grant to my said attorney-in-fact full and general power and authority to act on my behalf and I thus direct that the language of this document be liberally construed with respect to the power and authority hereby granted my said attorney-in-fact in order to give effect to such intention and desire." *Id.* at 587. The power of attorney then stated: "The enumeration of specific items, rights, or acts or powers herein is not intended to, nor does it limit or restrict, the general

---

**29.** We described this portion of the power of attorney as follows:

> The document then specifically authorized several acts pertaining to the management of Mrs. Duncan's property and finances, such as "tak[ing] possession of any and all monies, goods, chattels, and effects belonging to me, wheresoever found; ... receiv[ing], deposit[ing], invest[ing] and spend[ing] funds on my behalf; ... tak[ing] charge of any real estate which I may own in my own name or together with other owners, legally or equitably, and ... mortgag[ing], convey[ing] or sell[ing] said real estate and perform[ing] any acts necessary to mortgage, convey or sell said real estate." The document also authorized Ms. Ping "[t]o make any and all decisions of whatever kind, nature or type regarding my medical care, and to execute any and all documents, including, but not limited to, authorizations and releases, related to medical decisions affecting me; and [t]o generally do any and every further act and thing of whatever kind, nature, or type required to be done on my behalf."

*Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 586–87 (Ky. 2012) (alterations in original except last ellipsis).

and full power herein granted to my said attorney-in-fact." *Id.*

With this language in the power of attorney, *Ping* cannot be read to say that simply including specific grants of authority in a power of attorney necessarily limits the power to just those enumerated things. To do so would create a conflict between the elements of the power of attorney, the objects or transactions directed by the document, and the instructions on how those objects or transactions are to be carried out. The Third Restatement, which I think accurately states the law that applies, notes that "[m]ost conferrals of authority combine two elements." Restatement (Third) of Agency § 2.01 cmt. c (2006). The first, "always present," lays out the objects of the agency relationship, or "a manifestation, however general or specific, by a principal as to the acts or types of acts the principal wishes to be done." *Id.* To use a hard-worn example, if the document directed and authorized the agent to sell Blackacre, the sale of that land would be the object of the agency relationship.

"The second [element], less invariably present, consists of instructions or directives that specify how or within what constraints acts are to be done." *Id.* The specific examples of acts authorized to the daughter in *Ping* fell in this latter category. They were "included" examples, not limits, on her authority, and could reasonably be read only to guide the exercise of her authority. The first element, the object of the power of attorney, was a general grant of authority to act in the mother's stead. Indeed, that was the overarching purpose of the document, which was intended to be a durable power of attorney for a mother who was 79 years old and faced the constant danger of succumbing (and, in fact did succumb) to incapacity. The document was not intended to allow the daughter only to engage in a limited list of activities, which might mean many important, if not essential, tasks were beyond her reach, but to allow her to manage her mother's affairs generally, even if a given task was not included in the list of examples, during a period of incompetency.

This comports with the account of the law in the Second Restatement, on which we relied in *Ping.* Section 37 of the Second Restatement states that "general expressions used in authorizing an agent are limited in application to acts done in connection with the act or business to which the authority primarily relates," and that "[t]he specific authorization of particular acts tends to show that a more general authority is not intended." This seems to set up the general-specific dilemma that requires examining the *entirety* of the language in the power of attorney to discern the principal's actual intent.

But the illustrations in the commentary show that *Ping* overstated the effect of this provision of the Restatement. The very first example in the commentary to Section 37 includes seemingly broad language like that here: "a clause: 'giving and granting to my said attorney authority to do all acts as fully as I might, or would do, if personally present.'" Restatement (Second) of Agency § 37 illus. 1 (1958). The power of attorney in the example, however, is "to convey Blackacre." *Id.* According to the Restatement, the broad language does not give the agent authority to do anything except "convey Blackacre in the usual manner." *Id.*

But the power of attorney in *Ping* was not limited to a specific transaction. Rather, it was intended to allow the daughter to manage *all* of her mother's affairs in her stead, especially if she was incapacitated. Section 37 of the Second Restatement has

caused considerable confusion because lawyers—and courts—fail to note that a general power of attorney, especially one for the care and welfare of a person, is not limited to a single transaction. Most likely, this is why no analogous provision was included in the Third Restatement. In fact, the Third's cross-index notes that Section 37 of the Second Restatement is covered by Section 2.02, comment e, of the Third Restatement. That comment, however, says nothing about specific language displacing general grants of power; rather, it notes that the agent's authority is limited to those things that she reasonably believes the principal has consented to. *See* Restatement (Third) of Agency § 2.02 (2006) ("An agent does not have actual authority to do an act if the agent does not reasonably believe that the principal has consented to its commission.... Lack of actual authority is established by showing either that the agent did not believe, or could not reasonably have believed, that the principal's grant of actual authority encompassed the act in question."). In other words, the agent is to take into account all of the principal's instructions to her and must not ignore general instructions just because there are also specific ones.

Reading all of the provisions of the *Ping* power of attorney in light of this, a reasonable person would conclude that the daughter was not limited to the particular acts listed as examples. Instead, she was given "general power and authority to act on [her mother's] behalf." *Ping*, 376 S.W.3d at 587 (quoting the power of attorney). And interpreters of the document, including her daughter and the courts, were "direct[ed] that the language of this document be liberally construed with respect to the power and authority hereby granted [her] said attorney-in-fact in order to give effect to such intention and desire." *Id.*

But the "requisite and necessary" language in the opening of the power of attorney *does* add a layer of analysis as to what the daughter or any third party could reasonably believe was required or necessary.

The object of the power of attorney in *Ping* was management of the entirety of the mother's affairs, as the mother had become incapacitated by a stroke by the time the daughter had an occasion to exercise the power of attorney. *Ping*, 376 S.W.3d at 587. The power of attorney in *Ping* was executed for exactly such a contingency, since it was expressly intended to be a durable power of attorney. *Id.* Instead of a special agent, there was a general agent in *Ping* because the daughter was authorized to conduct her mother's affairs on an ongoing basis.

Thus the "requisite and necessary" language became a limit on her discretion. "A principal may provide instructions to general ... agents that further delimit their actual authority by restricting the discretion the agent would otherwise possess." Restatement (Third) of Agency § 2.01 cmt. d (2006). In essence, the language, included at the beginning of the power of attorney, sets a boundary around the general authority otherwise described in and granted by the document. Had that language not been included in the *Ping* power of attorney, the daughter's authority would have been very broad, limited only by her fiduciary duties and the rule of reasonableness. But the language *was* included and was thus a limit on the daughter's authority: she could only engage in those acts "requisite and necessary" to be done.

*Ping* embraced this limit, *Ping*, 376 S.W.3d at 592, and for that reason, I cannot say that the outcome in that case was

incorrect.[30] The opening line of the power of attorney literally said that the daughter had the power to do any and all acts that her mother could do if she had been present but only if those acts were "requisite and necessary." That qualifying language cannot be ignored any more than other language in the power of attorney.

But I do believe that *Ping's* discussion of general—vs.—specific grants of authority has caused confusion among the bench and bar, who have struggled to apply the decision to powers of attorney that often purport to grant very broad powers yet list specific actions as examples of what may be done. That reading of *Ping* allows those examples to devour the general grant, thus undermining the intent of the principals and requiring that we ignore the plain language and meaning of the documents.

Applying *Ping* this way would make true general powers of attorney impossible or at least unworkable. It is very difficult to draft a purely general power of attorney. The inclusion of specific examples of acts that may be done both guides the agents and answers specific questions about whether the agent has authority. But as *Ping* is being read, a drafter who includes such examples runs the risk of defeating the general power granted, leaving the agent without necessary authority. At the same time, the drafter who includes only specific grants of authority risks leaving the agent unable to act when needed.

This is certainly a difficult dilemma for lawyers drafting and principals executing general powers of attorney.

At the same time, such documents, especially durable powers of attorney, are becoming more and more of a necessity for the smooth operation of a person's later life. A very large portion of the American population is either already at (the Greatest Generation) or are very near (the Baby Boomers) the point in their lives where they face incapacity from medical conditions such as Alzheimer's disease or, as in *Ping*, the devastating effects of a stroke. Many of them prepare for the management of their affairs in the event of such incapacity by executing a broad power of attorney ahead of time.

I do not believe it was ever this Court's intent to impede this process nor to change long-established general agency law. Instead, our view was simply that entering into the arbitration agreement could not be reasonably construed as required or necessary, since admission to the nursing home was not contingent upon entering into the arbitration agreement. This decision had little or nothing to do with the fact that arbitration was involved—the same analysis would apply to *any* contract an agent would undertake for a principal under the terms of the *Ping* power of attorney.

Consequently, I join Justice Abramson's dissent for its reasoning on the main

---

**30.** I have some discomfort with the notion that the daughter's execution of the arbitration agreement did not fall within even the specific example powers in the power of attorney. It included (but was not limited to) the power "to execute any and all documents, including, but not limited to, authorizations and releases, related to medical decisions affecting me." *Ping v. Beverly Enterprises, Inc.*, 376 S.W.3d 581, 587 (Ky. 2012) (alteration in original). Although the arbitration agreement, in a vacuum, is not a health-care deci-sion, it was clearly related to health-care decisions, as it was part of the admissions packet for a nursing home. Arbitration agreements have apparently become a *de rigeur* part of nursing-home admissions paperwork. Of course, they are usually not required for admission, and admittees (or their agents) are free to decline to sign them. I cannot say that *Ping* was wrong in concluding that this specific power covered signing the agreement, however, precisely because it was not required for the admission.

points in these cases, but I have written separately to begin correcting any confusion about agency law by the part of our *Ping* decision that was actually not determinative in the result of the case. The strict-construction rule for limited or specific powers of attorney should not be applied to defeat a general power of attorney. The cases creating that rule do not support such a broad application of the rule, nor does sound policy.

Minton, C.J., joins.